1              UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3        HONORABLE ANDRÉ BIROTTE JR., U.S. DISTRICT JUDGE

4

5    UNITED STATES OF AMERICA,        )
                                      )
6                   PLAINTIFF,        )
                                      )
7            vs.                      ) No. CR 17-0404-AB
                                      )
8    1) ARLAN WESLEY HARRELL,         )
     2) JOHN RICHARD BRINSON, JR.,    )
9    4) KEITH ALLEN LAWNICZAK,        )
                                      )
10                  DEFENDANTS.       )
     _____)

11

12

13

14           REPORTER'S TRANSCRIPT OF PROCEEDINGS

15             THURSDAY, OCTOBER 17, 2019

16                    10:14 A.M.

17             LOS ANGELES, CALIFORNIA

18

19

20

21

22   _____

23           **CHIA MEI JUI, CSR 3287, CCRR, FCRR**
             FEDERAL OFFICIAL COURT REPORTER
24           350 WEST FIRST STREET, ROOM 4311
             LOS ANGELES, CALIFORNIA 90012
25                cmjui.csr@gmail.com

```
 1   APPEARANCES OF COUNSEL:

 2   FOR THE PLAINTIFF:

 3           OFFICE OF THE UNITED STATES ATTORNEY
             BY: DEVON MYERS
 4           ASSISTANT U.S. ATTORNEY
             312 NORTH SPRING STREET, 13TH FLOOR
 5           LOS ANGELES, CALIFORNIA 90012
             (213) 894-2434
 6                        - AND -
             U.S. DEPARTMENT OF JUSTICE
 7           CHILD EXPLOITATION AND OBSCENITY SECTION
             BY:  LAUREN KUPERSMITH
 8           1301 NEW YORK AVENUE, NW, 11TH FLOOR
             WASHINGTON, D.C. 20530
 9           (202) 514-1564

10

11   FOR THE DEFENDANT HARRELL:

             OFFICE OF THE FEDERAL PUBLIC DEFENDER
12           BY: PEDRO V. CASTILLO
             DEPUTY FEDERAL PUBLIC DEFENDER
13           321 EAST 2ND STREET
             LOS ANGELES, CALIFORNIA 90012
14           (213) 894-2854

15   FOR THE DEFENDANT BRINSON:

16           GREGORY NICOLAYSEN, ATTORNEY AT LAW
             27240 TURNBERRY LANE, SUITE 200
17           VALENCIA, CALIFORNIA 91355
             (818) 970-7247
18
     FOR THE DEFENDANT LAWNICZAK:
19
             THOMAS NISHI, ATTORNEY AT LAW
20

21

22

23

24

25
```

```
 1              LOS ANGELES, CALIFORNIA; THURSDAY, OCTOBER 17, 2019

 2                              10:14 A.M.

 3                               - - -

 4              THE CLERK:  Calling Criminal Case 17-0404-AB,

 5    United States of America versus Arlan Wesley Harrell; John

 6    Richard Brinson, Jr.; Keith Allen Lawniczak.

 7              Counsel, please step forward and state your

 8    appearances.

 9              MS. MYERS:  Good morning, Your Honor.

10              Devon Myers on behalf of the United States.

11              MS. KUPERSMITH:  Along with Lauren Kupersmith on

12    behalf of the United States.

13              THE COURT:  Good morning to you both.

14              MR. CASTILLO:  Good morning as well, Your Honor.

15              Pedro Castillo on behalf of Arlan Wesley Harrell

16    who is present in custody.

17              THE COURT:  Good morning.

18              MR. NICOLAYSEN:  And good morning, Your Honor.

19              Greg Nicolaysen, counsel of record for Mr. Brinson

20    who is also present in custody.

21              THE COURT:  Good morning to you both.

22              MR. NISHI:  Tom Nishi on behalf of Keith Lawniczak

23    who is present in court.

24              THE COURT:  Good morning to you both.

25              Mr. Nishi, if you wouldn't mind, I think there is
```

```
 1    a microphone behind the screen in front of you.  Just bring
 2    that closer to you so we can hear you.
 3              We are here today to discuss a number of matters.
 4    I guess first off -- apologize for the confusion.
 5              I hope, Mr. Nicolaysen, all was resolved last week
 6    with Mother Nature.
 7              MR. NICOLAYSEN:  Yes, finally over the weekend.  I
 8    thank Your Honor for understanding the 14 and where it
 9    connects to the 5 were shut down, and I simply couldn't get
10    out of the Valencia area.
11              THE COURT:  But your home is okay?
12              MR. NICOLAYSEN:  It is fine.  I thank Your Honor
13    for asking.
14              THE COURT:  I know there were some fits and starts
15    getting Mr. Lawniczak here.  I know there are various
16    stakeholders involved in the case.  So I apologize for
17    having to move the dates, but we're here now, and,
18    hopefully, we can resolve the matters at hand today.
19              We have a number of motions to suppress both
20    statements and evidence and then a motion to sever.
21              What I would propose is I want to just go through
22    the motions somewhat one by one, give the parties time to
23    argue anything further, and then I will give the parties my
24    thoughts as it relates to the motion.
25              We could start off with Mr. Harrell's statements
```

```
 1   that he made on the May 28th, 2017, interview.  So I guess
 2   it would be Mr. Nicolaysen.  Do you wish to be heard as
 3   relates to that?
 4            MR. NICOLAYSEN:  Your Honor, Mr. Castillo
 5   represents Mr. Harrell.
 6            THE COURT:  Sorry.  I'm getting --
 7            MR. NICOLAYSEN:  Your Honor, I am fine.  If the
 8   Court wishes to start with Mr. Brinson, we can do that.
 9   Whatever the Court pleases.
10            THE COURT:  Let's start with Mr. Harrell because
11   he has a number of motions filed.  So, Mr. Castillo, my
12   apologies.
13            MR. CASTILLO:  Yes, the motion to suppress
14   statement, Your Honor?
15            THE COURT:  Yes.
16            MR. CASTILLO:  So, Your Honor, I am sure the Court
17   has read the papers --
18            THE COURT:  Yes.
19            MR. CASTILLO:  -- as the Court indicated.
20            So our argument is the statements that Mr. Harrell
21   made on the day that he was arrested, the day that the
22   agents came to his house should not be admissible because
23   repeatedly during that questioning by the Homeland Security
24   special agents he requested a lawyer.
25            He asked more than once, "I want a lawyer.  I want
```

```
 1    a lawyer.  I want a lawyer."  And the agents ignored that

 2    request and simply continued asking questions.

 3              THE COURT:  Now, the government has indicated that

 4    they don't intend to introduce any statements that were made

 5    after he made a request for a lawyer.  So I am trying to

 6    understand sort of from your perspective where you think

 7    that line, if any, should be drawn.

 8              MR. CASTILLO:  I think, Your Honor, it should

 9    begin right at the advisement of Miranda.  In other words, I

10    think I submitted a transcript --

11              THE COURT:  Right.

12              MR. CASTILLO:  -- today to my motion, and I would

13    say anything after the second page where they advise him of

14    Miranda, "You have the right to consult with a lawyer" --

15              THE COURT:  I thought he says, "Yeah," and he

16    says, "So this is the interview right now."

17              MR. CASTILLO:  And I think that's the issue,

18    Your Honor.  Mr. Harrell had never been arrested before.  He

19    is a young man as the Court can see, never had, I don't

20    think, as much as a traffic ticket.

21              So here come armed Homeland Security agents, a

22    whole bunch of them, to his home in the early morning with

23    firearms, and they sequester him, start questioning him.  He

24    doesn't know what's happening.

25              His statement the interview, "Is this the
```

1   interview right now," is very significant because it means

2   you guys want to talk to me?  Shouldn't I have a lawyer?

3   And we see that from the subsequent statements where he

4   says -- the agent says, "Do you understand -- do you want to

5   read these rights?"  He says, "I think I understand."

6              THE COURT:  Right.

7              MR. CASTILLO:  So that to me is significant

8   because he didn't understand.

9              THE COURT:  But then what should the Court do with

10  the fact that I thought it was right after that exchange

11  then he's given a written statement of rights and a waiver

12  form and he signs that.

13             Does that suggest, then, that there is a

14  preliminary discussion, the written waiver and the signature

15  confirms what they had just discussed or --

16             MR. CASTILLO:  We do have a signed waiver,

17  Your Honor.  It's not clear to me from listening to the

18  audio and watching -- listening to the audio, rather,

19  because it is only an audio, whether he signs it there right

20  at the moment where he says, "I think I understand," or

21  whether he signs it afterwards.

22             We don't have a declaration from either one of the

23  two agents that are present there.  We only have -- the

24  government did not submit any declarations.  So we don't

25  know.  I presume the agents would say that he signed it

1   around that time.  But even if he did, Your Honor, I think

2   the question is the same.

3         He says right after that -- talks about his

4   parents, talks about whether his parents can, sort of, not

5   know about this.  They seem to tell him, "Well, this is your

6   chance.  This is your time to talk.  It's a one and only

7   deal."

8         All those are things to a young man figuring out

9   whether he should talk, whether he has a right to a lawyer,

10  whether -- what he has to say to assert those rights, I

11  think that that's significant.  So I would say that anything

12  after the Miranda advisement should not be admissible.

13        THE COURT:  What about later on during the course

14  of the interview?  They take a break, and then one might

15  argue he just starts talking again.

16        So let's assume I agree with you as relates to the

17  first part.  But then what happens later?  It's about 15 or

18  16 minutes in when he starts talking again, not in response

19  to any questions.  He just starts talking.

20        MR. CASTILLO:  And I think, Your Honor, if I

21  remember correctly, I think he's cold.  I think they offer

22  him some type of sweatshirt or jacket or something, and I

23  think that's the break.  There is a break.

24        There is a transition, and I would say that that

25  again is sort of the agents playing him.  At one point they

```
 1  ask him, "Do you want some gum?"  These are federal agents
 2  who are coming to arrest him for some serious charges, and
 3  they ask him if he wants some gum.
 4          THE COURT:  Is it your position that the agents
 5  might have set up this scenario, if you will, to ask some
 6  preliminary questions in the hopes that he might just start
 7  talking again?
 8          MR. CASTILLO:  I think we have a young man who is
 9  not sophisticated when we have these very two seasoned
10  Homeland Security agents who know how to get confessions.
11  We'll see that especially related to Mr. Brinson's motion
12  because Agent Squire was also there questioning Mr. Brinson.
13          But we have agents who know how to play people by
14  trying to be their friend, by trying to tell them, "This is
15  really your chance."  I think it makes those statements not
16  voluntary.  So I would say the Court should suppress those
17  statements.
18          THE COURT:  Let's talk about the statements that
19  were made in the car on the ride to Roybal.
20          How should the Court weigh those statements in the
21  overall context where it appears that they ask him if he
22  understood his rights.  They start reading from a card, and
23  he says, "I understand them," and he's willing to talk at
24  that time.
25          Does that suggest a knowledge of his -- a knowing
```

```
 1   waiver that occurred earlier when he was originally
 2   arrested?
 3           MR. CASTILLO:  I don't think it relates back,
 4   Your Honor.  Two days lapse.  The arrest was May 28th.  The
 5   statement was in the vehicle while he is being transported,
 6   is May 30th.  He's had some time to sit.
 7           And the government would want the Court to have it
 8   relate back to the original Miranda, I guess, waiver, the
 9   government would call it.
10           But I don't think it does because that's a
11   separate statement, and that's a statement where he's had
12   some time to think, I guess, and sit.
13           I think he's still confused about whether he --
14   when he is going to get a lawyer because they're still in
15   that second May 30th, statement.  There is some questions
16   about procedure and when his lawyer will be appointed.
17           The agents talk about what's going to happen in
18   court, that he may get bail, he may not get bail, he is
19   going to have a lawyer.
20           So I think that is separate.  The government would
21   want the Court to make that link, but I -- my argument would
22   be that it does not in any way relate back to the statement
23   on the day of his arrest.
24           THE COURT:  All right.  And if you don't mind I
25   may do a little bit of a -- for lack of a better term, sort
```

 1   of back-and-forth tennis match as we go through these

 2   issues.

 3           Let me hear from the government as it relates,

 4   again, focusing on the statements, Ms. Kupersmith.  And

 5   thank you again for flying out.

 6           MS. KUPERSMITH:  No problem, Your Honor.

 7           Your Honor, it's -- it sounds like defendant's

 8   argument boils down to that he wasn't being familiar with

 9   the process of being arrested, but that is certainly not the

10   standard.

11           And I think the transcript shows there were a

12   number of opportunities prior to his invocation of counsel

13   that he is provided his rights and he acknowledges he

14   understands.

15           THE COURT:  What are about Mr. Castillo's point --

16   "Do you understand these rights?" and his words are, "I

17   think I understand."

18           MS. KUPERSMITH:  I think you can't take that out

19   on of context what happened the several minutes before where

20   there was five other acknowledgements that he understood his

21   rights.

22           And I think even just the context of that

23   statement, he's asked, "So do you understand?  Do you want

24   to read these rights?" and he says, "I think I understand,"

25   which is --

```
 1            THE COURT:  But do you think -- and I am sorry to
 2   interrupt you.
 3            MS. KUPERSMITH:  No problem.
 4            THE COURT:  Do you think there is this -- I think
 5   acknowledgements when he says, "So this is the interview
 6   right now?"  Does that suggest an acknowledgment?  Or is it
 7   more like what Mr. Castillo says, he doesn't know what's
 8   happening, where he is, this is his first time in this
 9   situation.
10            Does that -- how much weight should the Court give
11   to that in determining what he says?  I think I understand
12   that maybe he doesn't understand what's happening.
13            MS. KUPERSMITH:  I think, Your Honor, you have to
14   take in the context of everything that happened.  So if I
15   could just go through the order of events that what happened
16   is he's read his rights.  He is asked specifically, "Do you
17   understand this?"  He says, "Yes."  That's number one.
18            He then confirms that this is the interview.  He
19   was told it was, and he says, "Okay."  That in and of itself
20   is a second understanding that he understands that this is
21   an interview and that this is his chance to make statements.
22   That's number two.
23            Third is he has confirmed again -- the agent says
24   to him, "I mean you good, you good to talk?"  And his
25   response is, "Yes, yes."
```

1          Number four is he then says -- the agent says to

2    him, "So do you understand?  Do you want to read these

3    rights?"  And he says, "I think I understand."

4          That is not an indication that he doesn't

5    understand.  It is not an indication that he wants to stop.

6    He is acknowledging the fact that the agent confirms, "Do

7    you want to read these," but it doesn't end there either.

8          Number five is at this point the recording is

9    pretty clear that the form is filled out at this point.  It

10   says -- the agent says, "So this is the form that says you

11   understand your rights," and he is specifically asked how to

12   spell his name.

13         So pretty clear that the form is being filled out

14   at that time, which is Number 5 of his opportunity to

15   understand and acknowledge his rights.

16         And I would submit, Your Honor, that beyond that,

17   he is able to coherently and intelligently answer questions,

18   which is also acknowledging that he understands what is

19   going on, he understands his opportunity to participate in

20   this interview.

21         It's not necessary to acknowledge his

22   understandings in writing even though he does, and his

23   participation is an implicit waiver of his willingness to

24   talk.

25         And I think, then, his acknowledgment later, when

```
 1    he does ask for a lawyer, is also understanding that he

 2    understands his right to ask for a lawyer.

 3            THE COURT:  Can one make the argument that perhaps

 4    the lightbulb went off later in the interview, he is saying,

 5    "Oh, this is serious, I need a lawyer now"?

 6            MS. KUPERSMITH:  That's possible, but that doesn't

 7    change the admissibility of his statements prior to that

 8    point because there was that voluntary and knowing waiver of

 9    his rights --

10            THE COURT:  And the government, I just want to

11    confirm -- you are not intending to introduce statements

12    made after he -- I think even the government concedes --

13    invoked and asked for a lawyer.

14            MS. KUPERSMITH:  Yes, with a caveat that were the

15    product of police questioning.  And any statements that he

16    made that were not the product of police questioning, the

17    agents didn't have a reason to just not listen to him or to

18    tell him to stop talking if they were not bringing up

19    questions that were creating a response.

20            If he was on his own bringing up questions, the

21    agents -- all of those statements are admissible, and I

22    think there is two very clear examples of that in the

23    transcript where the agents stopped talking to him, he

24    specifically says, "Hey, can I ask you some questions," and

25    then makes statements on his own.  And because those aren't
```

```
 1   the product of any interrogation, they're not the result of
 2   his invocation of counsel.  It's completely his desire to
 3   talk at that point.
 4              THE COURT:  What is your response to
 5   Mr. Castillo's argument that these are skilled agents -- and
 6   I am not putting words in Mr. Castillo's mouth -- that they,
 7   sort of, set this up, room being cold, do you want gum, to
 8   try to warm him up to speak again.
 9              MS. KUPERSMITH:  I don't think the transcript
10   bears that out.  I think the transcript shows there is a
11   moment in time where the agent says, "Okay, let's pause."
12   They are talking about getting him a sweatshirt, but there
13   is nothing that the agent says in that process of getting
14   him a sweatshirt and kind of explaining that this situation
15   is still ongoing that brings those statements that
16   Mr. Harrell makes.
17              And what the transcript shows is there are
18   statements that are completely outside of anything that the
19   agents are saying that do not impact Mr. Harrell's voluntary
20   decision to make some statements to the agents.  And the
21   agents aren't required to just not listen to him at that
22   point.  If he is on his own making statements, it's not the
23   product of any interrogation.
24              THE COURT:  Okay.  Thank you, Ms. Kupersmith.  I
25   think that's all the questions that I had.
```

```
 1            Mr. Castillo, can we jump back now and talk about
 2   your motion to suppress.  If you have anything you want to
 3   say in response, I will allow you that opportunity as well,
 4   but I wanted to shift to the motion to suppress evidence
 5   based on the search warrant that was executed at -- I
 6   believe it was Mr. Harrell's parents' home.
 7            MR. CASTILLO:  Yes.  The only thing I would add --
 8            THE COURT:  Why don't you step to the lectern.
 9            MR. CASTILLO:  I'm sorry.
10            The thing I would end with to, sort of, address
11   the government's argument that when he begins to talk and
12   it's a new discussion, I would say it's not because he is in
13   the same place, agents are in close proximity.  They're
14   asking him questions.
15            They might give him a little time to think, but
16   they know what's coming next.  They know at some point he is
17   going to ask something -- "Can I ask you a question?"  I
18   think it's a continuum.  I think the Miranda violation is
19   one that cannot be fixed.
20            THE COURT:  Let's shift, if we could, on the
21   motion to suppress the evidence.
22            I would like to get your synopsis of your argument
23   and the reason being is that it seems to me law enforcement
24   got this information that they claim was based on a reliable
25   tip with a nickname that was linked to Mr. Harrell and also
```

1    a gamer tag that was linked to Mr. Harrell, and there was

2    some other sort of identifying characteristics that linked

3    Mr. Harrell, where he lived, where he worked.

4         It seems to me that all of that in total satisfies

5    the probable cause standard, but.  Tell me what -- I'd like

6    to get your perspective on it.

7         MR. CASTILLO:  Thank you, Your Honor.

8         So the Court is correct.  What happened here is

9    that an individual gets arrested abroad.  They identify him

10   as FS 1, Foreign Subject~1 in the Complaint.

11        We don't know when that individual gets arrested.

12   All we know is that he is arrested abroad, and he is a

13   producer, he is someone who is in this realm who works in

14   this world.

15        He gets arrested at some point, I think before

16   May 23rd because as best as I can figure based on the

17   Complaint and the affidavit, May 23rd is when the government

18   agents began looking for the War Titan.

19        The information they get about the War Titan all

20   comes from FS 1.  And the crux of my argument is that the

21   agents failed to provide any real information about FS 1.

22   They didn't really indicate when he was arrested, which I

23   think would be significant, how long he had been detained,

24   what charges he had been arrested for, and what incentive he

25   was given to cooperate, what, sort of, carrot he was

```
 1    promised.
 2              THE COURT:  Is that -- how is that relevant to the
 3    motion to suppress?  One might argue maybe some of that is
 4    relevant if in fact he is going to testify at a trial, but
 5    we're talking about probable cause here.
 6              MR. CASTILLO:  And I know it's a low standard,
 7    Your Honor, probable cause is certainly not the standard
 8    that would be one that would be placed at a trial -- it's a
 9    lower standard.
10              But I think even with probable cause you have to
11    have facts that would lead the agents to believe -- here the
12    informant -- I will call him an informant.  They would have
13    to have information that would make them think that he was
14    credible and reliable.
15              THE COURT:  Could one make the argument that, if
16    this informant -- we'll just call him that for purposes of
17    this argument -- says, "Okay, this person lives in this
18    town, he goes by the gamer tag War Titan," photographs that
19    the informant has shows an individual working at a theater,
20    and sure enough they find this person Mr. Harrell works at
21    the same theater, when you put those together, is that
22    enough to suggest that at least the information that he has
23    provided has indicia of reliability?
24              MR. CASTILLO:  I think it would, but I think
25    before you get to that point the agents here -- and there's
```

```
 1   agents abroad and agents here in Philadelphia and Boston --
 2   they're sort of working together.
 3           But I think what needs to have happened is before
 4   the agents in the U.S. accepted the information given by the
 5   agents abroad, they need to know what steps the agents
 6   abroad took to confirm that what FS 1 was telling them was
 7   credible.
 8           In other words, they had FS 1 under arrest.  They
 9   had his computers.  Presumably they had his Xbox console.
10   They could have examined it and looked at it to see whether
11   he ever played with the War Titan, whether they ever engaged
12   in gaming, whether the items in his computer, the seized
13   evidence corresponded to what he told them about where he
14   got those items or those digital videos or images, whatever
15   the case may be.
16           And here it doesn't seem as though they did that.
17   They just, sort of -- I think some of the documents the
18   government turned over to me said, "We accepted the
19   information given to us by FS 1."  Well, there needs to be a
20   test, and our argument is that that test was not met before
21   they gave the name.
22           Say, for example, the War Titan had nothing to do
23   with anything.  Then the government would just go to
24   Microsoft or issue a subpoena and get the address for
25   someone who is completely unrelated to what we're talking
```

1    about here.

2              THE COURT:  All right.

3              MR. CASTILLO:  So I think that's what they didn't

4    do.

5              One thing I would note, Your Honor, is that there

6    is information in the affidavit about searches that were

7    conducted by government agents here.  And by "here" I mean

8    in the U.S.  They start I think at paragraph -- the Court

9    has the affidavit, paragraph 27.  Actually a little bit

10   before that, paragraph 25, the Charter Communications

11   subpoena which we have in discovery.  There is also a

12   mention of a clear check that they did, a public database

13   check.

14             I say that we accepted these statements as true.

15   I did ask just yesterday, and I apologize for the lateness,

16   of the government to provide me with any of the underlying

17   materials related to that clear check that they did, the

18   databases search, as well as the DMV search that's mentioned

19   in the following paragraph where they get vehicles related

20   to the address.  They haven't yet provided that to me, but I

21   want to let the Court know that that's something that's

22   pending.

23             But again, assuming those things are true, I would

24   say that that gets closer to probable cause, but I think the

25   missing link is that they didn't verify what FS 1 told them

```
 1   before they accepted his words at face value.
 2            THE COURT:  Thank you.
 3            Is it Ms. Kupersmith again, or are you switching
 4   off?
 5            All right, Ms. Myers.  So it seems like the crux
 6   of the argument is that the government didn't adequately vet
 7   FS 1.  Or to the extent it did, it's not documented, and
 8   your response.
 9            MS. MYERS:  Yes, Your Honor.  I think that law
10   enforcement here relied on the information provided by law
11   enforcement abroad.  There is sufficient indicia of
12   reliability in the information that was provided.
13            And because it's in the -- because that
14   information is located abroad, that is not within our
15   government's custody or control.  We are relying on the tip
16   that was passed to us.
17            The tip was sufficiently reliable because it
18   involves somebody who is involved in the same type of crime
19   as Defendant Harrell.  He said that he was involved in a
20   Wickr chat with Soole.  We knew that Soole -- law
21   enforcement already knew that Soole was on the dark web, was
22   producing child pornography involving multiple victims.
23            Additionally, the tip was that FS 1 plays Xbox
24   with the War Titan.  And so foreign law enforcement looked
25   at FS 1's devices.  They found the Wickr chat.  They found
```

1    photographs sent by Soole to FS 1, and so they're

2    corroborating the tip abroad because they have the

3    information from FS 1.  They go to his digital devices.

4    They see information that is corroborating what he has

5    provided already.

6              Additionally, FS 1 had child pornography produced

7    by Soole.  And so all of that adds to the reliability of the

8    tip.

9              Additionally, before that Soole had posted online

10   that he was affiliating with another producer from the

11   Website.  So those two data points correspond.

12             THE COURT:  You said Soole had posted online he

13   was affiliating with another producer.  He did not identify

14   that producer.

15             MS. MYERS:  No, he did not.

16             THE COURT:  All right.  I just want to make sure

17   I'm clear on that.

18             MS. MYERS:  I think the tip has sufficient

19   reliability.  There is no obligation for law enforcement to

20   uncover every stone connected to FS 1.  The information was

21   provided as a lead.

22             So I think that, if you look at the case which is

23   Patayan Soriano which we cited in our papers, there the tip

24   was reliable, and they determined there was a lot less

25   information in that tip than there was in FS 1's tip.

1        And the Court said, "Look.  There was a reason for

2   him to cooperate and to provide truthful information because

3   he has been apprehended."  And the tip was sufficiently

4   detailed.  Right?  We're not talking about somebody who is

5   arrested for fraud who is giving information about Soole.

6   It all makes sense.

7        Additionally, even if you take the tip aside, this

8   case would be analogous to the anonymous tip in Illinois

9   versus Gates where somebody gave a letter to law

10  enforcement.  It was detailed about the Gates' illegal

11  activity and their drug trafficking activity.  And there

12  what law enforcement did is exactly what law enforcement did

13  here, which was to corroborate the tip.

14       So law enforcement takes the War Titan piece of

15  information, they then connect it to Defendant Harrell.  And

16  then from that connection they conduct additional

17  investigation about Harrell that allows them to connect it

18  back to Soole.

19       For example, they found that defendant was living

20  at a place which was the subject premises which is

21  registered as a daycare.  He works at a Cinemark theater

22  which is the same type of photographic evidence that he has

23  provided to FS 1.

24       Additionally, the child that is on his father's

25  Facebook page is the same child that is in Soole's

1     pornography, child pornography.  That's a very strong link

2     connecting the defendant to Soole.

3          And so I think that under Patayan Soriano and

4     Illinois versus Gates, law enforcement had an abundant

5     probable cause, they corroborated the tip, the tip was

6     reliable, and they presented those facts to United States

7     Magistrate Judge Chooljian who determined that there was

8     probable cause.

9          So I think on those points there was nothing else

10    that law enforcement needed to do in connection with the

11    FS 1 tip.

12         However, at Mr. Castillo's request, we did go back

13    to foreign law enforcement -- and this connects back to the

14    Franks hearing component of defendant's motion -- to

15    determine whether some of the facts that Mr. Castillo wanted

16    to know about FS 1 were available to us.

17         And the information is contained in Exhibit E

18    which is attached to defendant's motion which is the

19    government's letter in response to defendant's discovery

20    request.

21         And there it identifies that law enforcement did

22    find FS 1's tip to be reliable because he had allowed them

23    to find, identify, and arrest other producers of child

24    pornography.  He had no criminal history including no

25    arrests for dishonesty or deceit, which increases the

```
 1    reliability of his information.  He had no difficulties with
 2    alcohol or narcotics.
 3           And so I think, if those facts had been available
 4    at the time and had been added to the affidavit, it would
 5    have increased the probable cause, not decrease it.  And,
 6    therefore, there is no reason for the Court to grant
 7    defendant's motion.  There is no reason for the Court to set
 8    aside Magistrate Judge Chooljian's finding of probable
 9    cause, and there is no basis for a Franks hearing,
10    Your Honor.
11           THE COURT:  Thank you, Ms. Myers.
12           Mr. Castillo, I will allow you an opportunity to
13    respond as it relates to this motion, and then I want to
14    talk about the last motion as relates to your client, and
15    that's the motion to sever.
16           MR. CASTILLO:  Thank you, Your Honor.
17           Well, Your Honor, I guess it just goes back to the
18    argument that linking the War Titan to Soole is what the
19    government wants the Court to accept, that all the steps
20    were taken to do that.
21           And I think the biggest thing is we need to --
22    what they needed to do was to figure out, sort of, the
23    reason why this FS 1 was providing this information, whether
24    it was for self-gain or some kind of benefit that was
25    promised to him.
```

 1          I think that would be relevant.  We don't have a

 2    record that supports that here.  The government says,

 3    "Nothing was promised, he just provided the information, and

 4    we followed the lead."

 5          But I think it is significant for the Court to

 6    look at a person's motivation, what relationship that person

 7    had with Mr. Harrell, and why he said what he did.

 8          THE COURT:  Would your argument be any different

 9    if, let's say, instead of identifying this individual as

10    FS 1, it was just an anonymous tip?

11          MR. CASTILLO:  I think it would be -- I think the

12    argument would still be the same.  I think we still need to

13    know what the basis is for that person's knowledge and what

14    their motivation, what their gain is, what they're promised.

15    People don't just speak out against others, I don't think,

16    without a reason, and here we don't know what that reason

17    was.

18          THE COURT:  All right.  And the last motion is the

19    motion to sever, Mr. Castillo.

20          So I would like to hear your thoughts relative to

21    that.  I will be candid with you.  I think it's a little bit

22    of an uphill climb for you as relates to that in particular

23    because it strikes me, just based on the charging documents,

24    they're charged as co-conspirators.  I mean, you know, we

25    all know that the burden is pretty high, but I want to give

```
 1    you an opportunity to be heard.

 2              MR. CASTILLO:  Thank you, Your Honor.

 3              So I guess the reason for the motion to sever, the

 4    Court knows that this -- the conduct here is pretty

 5    egregious.  I don't think anyone would minimize it or say

 6    that it's not something that is serious and impactful and

 7    will draw people's emotions in.

 8              And I think that having Mr. Harrell joined with

 9    Mr. Brinson and the others and having the government present

10    all of this evidence that will be overwhelming and it will

11    take time and they'll produce victim after victim, I think

12    the impact of particularly of defendant's statements -- and

13    here it goes in pretty much every direction because

14    Mr. Harrell makes statements that implicated Mr. Brinson,

15    Mr. Brinson made statements that implicated Mr. Harrell,

16    Mr. Lawniczak made statements that implicated Mr. Brinson,

17    and vice versa.  And Mr. Martinez who is not here also made

18    statements.

19              The impact I think of having -- and I think the

20    only -- I put this in my motion.  I think the only charge

21    that has the, sort of, umbrella charge is the first count, I

22    believe.

23              THE COURT:  But that's a significant count.  It's

24    alleging an enterprise involving all of these defendants.

25    And so wrong or right, the Court is struggling with the
```

```
 1   notion that you have this charge.  It envisions charging
 2   multiple individuals, and it's hard for the Court to say,
 3   "Oh, but we should sever this simply" -- look.  It strikes
 4   me that the argument by and large is that, look.  There is a
 5   significant amount of evidence here.  Given the nature of
 6   the charges, it may inflame the jury, and that's going to
 7   have a negative consequence.
 8          I'm not trying to minimize that.  It would be one
 9   thing if it was just three or four individuals charged with
10   producing child pornography.  But the charge is engaging in
11   a child exploitation enterprise.
12          The government has the burden of proving that.  If
13   they believe they can prove that, I struggle with why the
14   Court should sever Mr. Harrell based on that.
15          MR. CASTILLO:  I guess the only thought is
16   flipping that.  If that's the case, the Court can just have
17   a trial in Count 1 with all defendants and then separate all
18   the other counts against each other with respect to each
19   defendant.
20          I know that will take time, and it will, sort of,
21   be something -- a burden on the government, but I think the
22   rights of the defendants here are pretty significant.
23          THE COURT:  Okay.  Ms. Kupersmith.  You are going
24   back and forth here I see.
25          I am curious your response to Mr. Castillo's
```

```
1    suggestion let's do a trial on just Count 1 as relates to
2    all defendants, and, as relates to the remaining counts,
3    those get severed and we try this three or four other times.
4             MS. KUPERSMITH:  I think in terms of judicial
5    resources, Your Honor, that is not an efficient use of it.
6    I don't think that's anything supported by the case law.
7             The defendant must show that there is -- that the
8    denial of severance of proceeding with a joint trial is some
9    violation of substantive right.  Even if we didn't have the
10   Count 1, there is significant overlap in the other charges
11   that exists in terms of the evidence that would be presented
12   against the different defendants, and the standard is just
13   not let's try and separate it for the hopes that it makes it
14   better for everyone.
15            There -- in this case the disparity of volume of
16   evidence is certainly not a ground for severance --
17            THE COURT:  Ms. Kupersmith, do me a favor.  From
18   one fast talker to another, our court reporter's fingers are
19   going to fall off at this pace.  If you can slow down,
20   please.
21            MS. KUPERSMITH:  Your Honor, there is just no
22   support for why that that should be the solution.  Even if
23   we take outside the context of Count 1, there is a lot of
24   overlap in the different production counts.  The Count 17
25   which is the obtaining custody for the purpose of creating
```

1  child pornography relates significantly to Count 18 for

2  Defendant Lawniczak of the sex trafficking charge.

3          Even for the production counts themselves, there

4  is a lot of evidence that would be related to each other.

5  Both Defendant Harrell and Defendant Brinson abused some of

6  the same children, also abused some of the same children

7  together.

8          So that evidence would still be presented.  And to

9  separate those trials doesn't make a lot of sense for

10  judicial resources purposes, but it also doesn't make any

11  sense because there is no denial of substantive rights by

12  joining those counts.

13          And I would point the Court to DeRosa which is a

14  Ninth Circuit case which found that the jury could fairly

15  evaluate the evidence in light of careful limiting

16  instructions even when the count that formed the basis for

17  joinder was dismissed.

18          So even if we had Count 1 proceed in a separate

19  charge I think the government would still be moving for

20  joinder properly because of all of the overlapping evidence

21  in this case.

22          THE COURT:  I am assuming you all have done this

23  much more than I ever did.  What would you envision would be

24  a limiting instruction?  The standard consider each count as

25  to each defendant, you are supposed to consider the evidence

```
 1    as it relates to each defendant and decide on each defendant

 2    separately?  Or would there be something more tailored to

 3    this case?

 4            MS. KUPERSMITH:  Your Honor, I have not given

 5    thought to exactly what that limiting instruction would be.

 6    However, as Your Honor points out, this charge in particular

 7    envisions multiple defendants.  And so I am sure there are

 8    examples of other Courts for specifically the enterprise

 9    charge as well as production charges that we could go back

10    and craft.

11            I would imagine some of it is going to depend on

12    how the evidence comes in, which specific defendants end up

13    going to trial, whether or not there are any of the

14    co-defendants who testify.

15            And so the limiting instruction would likely be a

16    little bit more tailored than just a general one, but I have

17    no doubt that between the parties and the Court we would be

18    able to craft something that sufficiently addresses those

19    issues.

20            THE COURT:  Thank you, Counsel.  I appreciate it.

21            Mr. Castillo, anything further as it relates to

22    this motion, the motion to sever?

23            MR. CASTILLO:  No.  Submitted.

24            THE COURT:  Let's, if we could, shift over to

25    Mr. Brinson.  He has two motions, Mr. Brinson does.  So
```

 1    let's start with the motion to suppress the statements.

 2              MR. NICOLAYSEN:  Your Honor, good morning.

 3              Greg Nicolaysen for Mr. Brinson.

 4              I would ask the Court's permission to play about

 5    one minute of the videotaped post-arrest interview which

 6    contains what I contend is a valid invocation of the right

 7    to counsel, and then I am just now trying to be clear on how

 8    the ELMO may be used because there are photos.

 9              THE COURT:  Is the ELMO -- is the drawer open?

10    Okay.

11              MR. NICOLAYSEN:  I think we are there.

12              If the Court please, I am going to begin by

13    putting the excerpt of the post-arrest interview of

14    Mr. Brinson.  The statements at issue begins just after

15    Minute 27.  And I should put this into context.  This is a

16    5 1/2 hour interview.

17              I strike my own word "interview" -- interrogation.

18              And when I ask Your Honor to seriously consider

19    the legitimacy of this invocation of counsel, it's so

20    important to know it's at the outset.  It's not halfway

21    through or towards the end.  It's at the very beginning.

22              Unlike Mr. Harrell where the government says,

23    "Well, we will stipulate not to use statements after a

24    certain point," that tactical option is not available to the

25    government here because Mr. Brinson -- and I will note this

```
 1   in a moment.  My papers discuss it at length -- remained
 2   absolutely quiet for the first hour.  It was the most
 3   agonizing thing to watch.
 4            And I ask Your Honor for permission -- I will just
 5   put a few photos.  They're exhibits to the motion -- to
 6   depict at minute 27 at the very beginning of the 5 1/2 hours
 7   we have this.
 8            Let's see if the audio -- I'm hoping the audio.
 9       (Exhibit played.)
10            MR. NICOLAYSEN:  This is 26 minutes and 22
11   seconds, do you see the quiet?  This is indicative of the
12   agents pushing.
13       (Exhibit played.)
14            MR. NICOLAYSEN:  That's the agent assuming it.  My
15   client hasn't said anything.
16       (Exhibit played.)
17            MR. NICOLAYSEN:  "Basic stuff."  Make it sound
18   benign.
19       (Exhibit played.)
20            MR. NICOLAYSEN:  And that speaks volumes.
21            THE COURT:  Let me hear you --
22            MR. NICOLAYSEN:  The interrogation should have
23   stopped at that point --
24            THE COURT:  You are saying that the statement,
25   "You said I could have an attorney," equates to an
```

```
 1    invocation of, "I want an attorney."
 2           MR. NICOLAYSEN:  It absolutely is.  And one of the
 3    concerns that I have is the way the government has opposed
 4    this motion.  The government's approach is to be hyper
 5    literal in expecting that a member of our society, anybody
 6    here questioned by police, should be so exact and so precise
 7    as to say, "I want an attorney," whereas to say, "You said I
 8    could have an attorney," sorry.  That doesn't rise to that
 9    level.  You are out of luck.
10           That distinction is artificial and nothing but a
11    tactic by the government to preserve this post-arrest
12    interview interrogation because they want to use it at
13    trial.
14           These are artificial distinctions.  And I should
15    emphasize my client has no criminal history.  He has a
16    little skirmish as a juvenile that was dismissed.  This is
17    not someone who has any background with engagements or
18    encounters with law enforcement.
19           Your Honor, myself, my colleagues on the panel, we
20    deal with gang members who are in their mid, late 20s, and
21    by that stage in their life they've dealt with cops so
22    frequently they have no hesitation to say, "I want a
23    lawyer," and they do say that many times because they have
24    juvenile records.  They have been in and out of CYA.
25           We have to be respectful of what it means for a
```

 1  member of our society with no background who was arrested on

 2  a case of this type being challenged by -- confronted by

 3  seasoned agents who know -- they're trained at the academy.

 4  They know how to do this -- who will not let this guy go.

 5          And my client's a minority.  It's worth noting.

 6  There are anxieties when you are black.  You get

 7  particularly scared when you are sitting in an interrogation

 8  room with cops.

 9          So what do we expect of Mr. Brinson under the

10  Fifth Amendment?  What is the real expectation under the law

11  when Mr. Brinson says so early in the 5 1/2 hours, "You said

12  I could have an attorney present."  That's enough.

13          THE COURT:  Let me stop you for a second.  Look.

14  When I watched the video, you know, Mr. Brinson, he's not an

15  idiot.  He is a pretty sophisticated, intelligent human

16  being.

17          Are you suggesting that the environment that he

18  was placed in put him in a scenario where at the time he

19  said, "You said I could have an attorney," that what he

20  meant was, "I want to have an attorney," even though later

21  on he talks, he asks questions, he talks about a whole host

22  of other things with a level of knowledge, sophistication?

23  And quite frankly again I go back to -- he seems like a

24  smart person who knows the gig is up and now it's time to --

25  I don't know what the right word is.  Now it's time to just

 1    tell it like it is.

 2          MR. NICOLAYSEN:  Sophistication is a relative

 3    concept.  People can be sophisticated in some context but

 4    not in others.  I am not saying he is not sophisticated in

 5    certain aspects of everyday life.

 6          But this is not someone who has a history of

 7    encounters with law enforcement.  We all know the nature of

 8    the charges in this case.  This is not shoplifting.

 9          So when he's been arrested and he's in that

10    windowless interrogation room with trained agents who are

11    not letting him go -- and I am going to put on the ELMO a

12    few of the photos -- they have no intention of honoring his

13    request for a lawyer.

14          His sophistication of the outside community and

15    everyday life and the job that he may have does not

16    translate legally into sophistication for purposes of being

17    able to articulate with a high level of technical precision

18    a request for an attorney.

19          We have to understand the anxieties, the fears,

20    the lack of experience with cops, the training of these

21    cops.  And when we look at the 5 1/2 hours, those agents had

22    no intention of honoring a request for an attorney.

23          When we see how the agents redirect the

24    interrogation, which my papers briefed in detail with quotes

25    and excerpts from the interview, interrogation, it's all

1    about redirecting.  It's all about instilling in

2    Mr. Brinson -- again, as I argue in my papers, the dilemma

3    that if you, Brinson, want an attorney, you are going to

4    lose strategically.  You are going to lose an opportunity

5    that we're giving you right now to cooperate.  That kind of

6    tactical dilemma completely undermines the constitutional

7    right to an attorney.

8            The agents had no business intimidating a suspect

9    especially one with no background with the police into

10   thinking, boy, my constitutional right, I am going to get --

11   excuse my language -- I am going to get screwed if I use my

12   constitutional right to a lawyer because the agent's telling

13   me it's now or never.  This is it.  This is your one and

14   only chance to help yourself.

15           That's the kind of manipulation that the courts in

16   Rodriguez and Henry which I discussed at length rejected as

17   a type of tactical manipulation that is unacceptable.

18           THE COURT:  Is it your position that the tactical

19   manipulation -- well, let me rephrase that.

20           You talk at length about the agent's experience,

21   the fact that they kept him in the room for five hours.

22   Agents have experience.  They are trained to

23   interview/interrogate individuals, and those interviews can

24   take time.

25           Are you suggesting that there should have been a

1    time cap on this and that they should not have used the

2    techniques that they have been trained in to try to get

3    Mr. Brinson to talk?  Is that it?

4           MR. NICOLAYSEN:  We all know that these are fluid

5    procedures.  There is no hard-and-fast rule.  We know that.

6    There is no such thing as a 60-minute limit.  If you don't

7    get what you want in 60 minutes, agents, you are done.

8           We all understand this is not a black-and-white

9    process.  It's very subjective.  It has to be specific to

10   the defendant and the circumstances of that interview.

11          But here, when a defendant invokes his request,

12   "You said I could have an attorney," at Minute 27 of a

13   5 1/2-hour interrogation, and you look at the interrogation

14   as I have briefed at length and you see how the agents just

15   essentially blow him off -- that's really what they're

16   doing -- and they redirect the conversation to the substance

17   of the investigation, they're not honoring anything to do

18   with getting an attorney, and, in fact, convey very clearly

19   the downside to him, "If you get a lawyer, you are going to

20   lose.  You are going to lose big."

21          And they say at the end -- and I argued this in my

22   papers -- at the very end they give it very clearly.  "If

23   you had asked for an attorney, you wouldn't have been able

24   to cooperate the way you did," as if he really helped

25   himself.

```
 1              We're here to suppress statements the government

 2    is going to be using against him at a trial, but all those

 3    five hours the agent was -- the two agents were conveying,

 4    "If you don't invoke a lawyer and you speak to us, you are

 5    going to help yourself.  You are cooperating."  It's

 6    complete manipulation.

 7              Your Honor asked can they use tactics.  Of course

 8    they can use tactics, but it's a question of degree.  And

 9    here the degree was so overbearing.  And what we cannot

10    forget is that first 60 minutes.  I just want to -- I don't

11    know --

12              THE COURT:  Before you get there, I come back to,

13    "You said I could have an attorney present."  I thought the

14    agent says in response to that, "Yeah, you can have one if

15    you want, and, if there is something you don't want to

16    cover, we'll stop the interview."

17              Again, I struggle with how that statement is

18    somehow an invocation of, "I want an attorney."  And again

19    with someone who appears in the video to be intelligent and

20    sophisticated.  And I get it maybe not in the,

21    quote/unquote, criminal realm, but when someone says, "If

22    there is something you don't want to cover this interview

23    could stop," I would think Mr. Brinson would say, "Okay.

24    That's it.  I'm done.  I want the attorney."

25              MR. NICOLAYSEN:  We are asking too much of members
```

```
1    of the public.  Sometimes we as lawyers, judges perhaps, we

2    live in an intellectual vacuum in a sense.  We don't

3    actually ourselves undergo these interrogations.  We

4    litigate them in the courtrooms.  So we have a tendency to

5    discuss them a little too abstractly.  I think we have to be

6    careful about that approach because what we see is the

7    dynamics of what is going on.

8             The photo here on the screen is an exhibit to the

9    motion.  It's just one example of -- and this is 50 minutes,

10   twice the time since he said, "You said I could have a

11   lawyer."

12            And we have here another picture.  Look at the

13   agonizing -- it doesn't matter if the agents are now at a

14   later point in the interview saying, "If there is something

15   you don't want to cover" because by then the agents have

16   already been pushing him and pushing him, and they

17   disregarded his statement, "You said I could have a lawyer."

18            And when we see in the video -- these are

19   screenshots from the video, and these are just very few

20   examples.  The video was replete with this in the first 60

21   minutes.

22        Mr. Brinson not talking, not saying anything,

23   displaying a level of true agony, really it's agony.  And

24   the papers point out that at a certain point he wants to

25   vomit, wants to go to the bathroom.  They give him a bucket.
```

1    They take him at one point.  He is in complete physical

2    deterioration.

3           It's just -- this next photo is such a glaring

4    illustration of what he is going through.

5           How can that person be criticized for not, once

6    again, stopping the interview because he is, apparently,

7    sophisticated?

8           I ask Your Honor to differentiate between the

9    levels of sophistication and self-control that we can

10   exercise in our everyday life with our families with our

11   colleagues and strangers versus what happens in that

12   interrogation room.  Look at that picture, and that's just

13   halfway through the hour.

14          THE COURT:  Mr. Nicolaysen, one could make the

15   argument those pictures aren't evidence of some physical

16   deterioration.  It's evidence of -- all right.  My back is

17   up against the wall, and there is no way out for me now.

18          MR. NICOLAYSEN:  Well, this is -- the one we have

19   on the screen here also an exhibit to the motion, this is

20   where we're talking about a person now who has expressed the

21   need to vomit.

22          And when you are at that point, you are in such a

23   confused mental state that you can no longer be asked to

24   rationally say, "I want to, once again, invoke my right to

25   an attorney."

```
 1              The government is being much too literal, much too
 2    technical in holding Mr. Brinson to a standard of precision
 3    in regard to his invocation of an attorney.
 4              And the cases we cite point out very clearly that
 5    tactics that create confusion mixed together with the
 6    repeated and prolonged nature of the questioning are
 7    relevant factors in the Fifth Amendment analysis.  That's
 8    our motion at page 30 --
 9              THE COURT:  If I could stop you.
10              MR. NICOLAYSEN:  Of course, Your Honor.
11              THE COURT:  Tell me what you believe are the,
12    quote/unquote, tactics that created confusion.
13              MR. NICOLAYSEN:  There is no one answer to that.
14    The motion -- and I am sorry.  I'm not trying to avoid the
15    question, but our motion has long excerpts from the
16    videotape that show the repeated pattern of wanting him to
17    go back to that -- the substance on the -- people are in the
18    courtroom.  I won't use the term.  It's under seal, but it's
19    the subject of the investigation.
20              And the agents use terminology that trivialized
21    the severity of the discussion treating it almost like a
22    conversation.  We saw it when I played the excerpt.  They
23    want to talk about basic stuff, quote/unquote.  There is
24    nothing basic about it.  This is an attempt to have him
25    completely incriminate himself and, basically, plead guilty
```

```
 1   in the middle of an interview.

 2           So the agents are clearly manipulating

 3   Mr. Brinson's ability to appreciate the severity of this

 4   interrogation, and it's the persistence.  And in answer to

 5   your question, I ask the Court go back and seal the excerpts

 6   because we have a lot of footnotes --

 7           THE COURT:  I have spent a lot of time going --

 8           MR. NICOLAYSEN:  I thank the Court very much, a

 9   lot of footnotes in the motion to specific calibrated points

10   during the interrogation that show the agent's -- what I

11   call the unrelenting persistence.  They will not let him go.

12           So I argue -- I know the government doesn't agree,

13   but the Henry case that we discussed primarily on pages 33

14   and 34 I think is very applicable here where the agents are

15   using very similar tactics -- the Henry opinion says

16   slippery and illegal tactics, but what we have is right

17   after invoking the right to an attorney, which is, of

18   course, my characterization, but I think it's the right one,

19   my client sat silently, doesn't say a word, and the agents

20   just sit there with him for more than five minutes of total

21   silence and the agents say, quote, "Nothing surprises us,

22   John.  This isn't the kind of thing you can talk about with

23   buddies down at the bar."

24           It's just lulling him into this false sense of

25   security, wanting Brinson to be comfortable, not allowing
```

```
 1    Brinson to understand that he is about -- that the agents
 2    want him to completely open up and incriminate himself,
 3    plead guilty.
 4            The agents just ignored the statement that I
 5    played -- "You said I could have an attorney."  And within
 6    the next five minutes, "When did you first find" -- blank --
 7            THE COURT:  Mr. Nicolaysen, could I stop you for a
 8    second?
 9            MR. NICOLAYSEN:  Sure.
10            THE COURT:  You say that the agents ignored the
11    request.
12            MR. NICOLAYSEN:  They completely ignored it.
13            THE COURT:  Is that a fair characterization when I
14    thought the colloquy was, "You said I could have an attorney
15    present," and the agents respond by saying, "You could have
16    an attorney if you wanted, and if there is something you
17    didn't want to cover, we'll stop."
18            That's not ignoring it.  I assume the government
19    is going to say that's just answering the question; right?
20    Or I'm not going to say "right."
21            MR. NICOLAYSEN:  The government does say that.
22    The government takes what I call a hyper literal approach.
23    The government's position is you have to be unequivocal and
24    absolutely precise and say, "I want an attorney present.
25    I'm not going to talk to you without an attorney."
```

1          There are people in our society who are capable of

2    saying that.  I have clients who have that, as Your Honor

3    uses the term, "sophistication."

4          But we must not allow that expectation to become a

5    general rule applicable to our entire society because people

6    like my client with no history of encounters with law

7    enforcement who is clearly undergoing severe stress is not

8    going to speak at that level of precision.

9          He's also a minority.  There is a unique anxiety.

10   It's different than if I am talking to police officers.

11   There are cultural factors that have to be weighed in the

12   mix here.

13         So my client, if we want to talk in a way

14   favorable to the government, maybe he was a little indirect.

15   I don't agree with that, but let's just say for the sake of

16   argument he was a little indirect.  The agents should have

17   stopped and said not -- "You can have an attorney if you

18   want" because that use of English once again puts the burden

19   back on Brinson -- and instead say, "Would you like an

20   attorney?  If you would like one, we'll arrange -- we'll

21   stop the questioning now."  That would be more consistent

22   with the legal standard.

23         But instead look at the communicational style of

24   the agent.  "You can have an attorney if you want," and then

25   goes on and continues to ask questions about the substance

1   of the investigation, putting that burden back on

2   Mr. Brinson when it's clear that there was some hesitation

3   in Mr. Brinson, very understandable when he says, "You said

4   I could have an attorney."

5         This guy is terrified, and the law must respect

6   that and not allow the agents to come back with a style of

7   speaking that simply puts the burden right back on the

8   suspect.  That to me is exactly what Henry and Rodriguez was

9   talking about those, quote/unquote, slippery and illegal

10  tactics.

11        THE COURT:  I am curious as to your response --

12  the government talks about, well, look.  Government takes a

13  different view, obviously, but then they refer to letters

14  that were written by your client.

15        MR. NICOLAYSEN:  Sure.  Let's talk about that.

16        THE COURT:  I would like to get your analysis of

17  what those -- A, should the Court consider those letters; B,

18  to the extent the Court considers those letters, where does

19  that tip -- where does that move the discussion in the

20  analysis?

21        MR. NICOLAYSEN:  Right.  I am surprised the

22  government obtained them, had included them, and I don't see

23  a foundation being presented to this Court that justifies

24  the utilization of those letters.  I think that remains a

25  questionable legality.

```
 1              THE COURT:  Even though -- again, I recognize your
 2     client is not sophisticated.  I think it's pretty clear in
 3     virtually every prison, particularly federal prison, phone
 4     calls that you make are recorded, communications you make
 5     can be seized and reviewed.  You may be -- I'm surprised to
 6     hear you say you are surprised given your experience.
 7              MR. NICOLAYSEN:  Well, it is an interception that
 8     does surprise me for purposes of being used offensively in
 9     litigation.  Your Honor is absolutely right.  Inmates don't
10     have rights of privacy in those regards, but those are
11     prison management issues.  Those are internal security
12     issues.  They're not related to litigation, and that's why I
13     expressed surprise.
14              But be that as it may, let's talk about how the
15     government asks Your Honor to consider the content of the
16     letters.
17              There is a word that the government thinks is of
18     great relevance in rebutting the invocation of counsel, and
19     that's the word "compelled."  Yes, Your Honor is very aware
20     of it.
21              So the gist of it is I, Mr. Brinson, felt
22     compelled as if somehow that is indicative of being
23     voluntary.  I submit to this Court the word "compelled" is
24     synonymous with coerced, and why wouldn't it be?  Once again
25     for all the reasons stated in the motion and here today
```

```
 1   Mr. Brinson was in a huge state of both anxiety and under
 2   the control of agents who literally wouldn't take no for an
 3   answer.
 4            And we cannot forget that any type of
 5   self-incriminating statement was not made until after the
 6   one-hour point.
 7            That first hour is characterized by what we see in
 8   these photos.  We could spend the whole morning -- photo
 9   after photo he is just moving and twitching and putting his
10   hands on his face and his head down on the table not knowing
11   what to do, and the agents just sit there calmly as they are
12   trained to do and keep asking him questions about the
13   substance of it.
14            So now we have a letter written while he was in
15   custody, and he says, "I felt compelled."  Why should
16   "compel" seem to suggest voluntary?
17            He felt coerced.  That's the interpretation.  So
18   the irony being I thank the government for submitting the
19   letter even though I don't think it's an appropriate use of
20   a prison interception.  Who cares?  It's an honest
21   statement, "I felt compelled."  He did feel compelled.
22            THE COURT:  You are saying compelled --
23            MR. NICOLAYSEN:  Is coerced.  It absolutely is.
24   "I felt compelled."  Compelled.  Again, when we use terms,
25   we have to differentiate between their common parlance in
```

1  outside society where you and I may feel compelled to act a

2  certain way out of ethics or morals or social virtue -- I am

3  compelled, I am motivated because that's how the government

4  would interpret it.

5      I am compelled to do certain things for my kids

6  because I am a good parent.  We are compelled in good ways,

7  and it's all voluntary.

8      It doesn't mean that here, and it is pure

9  speculation for the government to suggest that it does.

10  Compelled, he's felt coerced that he had no choice.  There

11  is nothing else in the letters to put that word "compelled"

12  into any other context than to say it means coerced.

13      So "compelled" could be motivated in the good

14  sense in the outside world.  But in this context, it means

15  what I am suggesting to Your Honor.  He felt absolutely

16  overwhelmed by that experience with the agents.

17      He doesn't self-incriminate until after an entire

18  hour, and the interview is 5 1/2.

19      I think this interrogation does track Rodriguez

20  and Henry.  The government tries to differentiate, but what

21  we must remember when we cut to the chase and look closely

22  at the government's opposition, it's all about trivializing.

23  It's about being dismissive, and that's simply wrong.

24      An entire 60 minutes of agonizing, and there is a

25  physical deterioration, Minute Number 27, "You said I could

```
 1   have an attorney."

 2           This is the type of tactical manipulation the

 3   courts have rejected.  So I do ask the Court to suppress all

 4   of his statements because they begin after the one-hour

 5   point as I say.

 6           THE COURT:  Thank you, Mr. Nicolaysen.

 7           Who wishes to respond?  Ms. Kupersmith.

 8           MS. KUPERSMITH:  Yes, Your Honor.

 9           THE COURT:  Is the government being overly literal

10   and technical in its analysis?  "You say I could have an

11   attorney," question mark.

12           MS. KUPERSMITH:  Your Honor, I appreciate that

13   defense counsel believes this is some new-found government

14   strategy, but I would submit it is actually completely based

15   on case law precedent.

16           Specifically in Davis the question was maybe I

17   should talk to a lawyer.  Pretty remarkably similar to this

18   case, and the Supreme Court held there is no extra layer of

19   prophylactics to prevent police questioning when the suspect

20   might want a lawyer.  Unless the suspect actually requests

21   an attorney, questioning may continue.

22           THE COURT:  The invocation must be equivocal from

23   the government's standpoint.

24           MS. KUPERSMITH:  Yes, Your Honor.  And I think in

25   this case it is perfectly clear that he is read his rights,
```

 1    he confirms one of those rights, the agents then respond

 2    with -- confirmed that, if he wanted an attorney he could

 3    have one, that he could stop them from talking, that he

 4    could dictate what topics are covered, and he could dictate

 5    the direction of the conversation.

 6          There is no later request for an attorney.  The

 7    only time an attorney then comes up again is at the very end

 8    of the interview which is brought up by Mr. Brinson himself,

 9    not by the agents, where he says, "So if I would have asked

10    for an attorney before answering any of your questions."

11    Pretty clear from Mr. Brinson's standpoint that he did not

12    ask for one because he is confirming, "So if I had asked for

13    one, would this have gone differently?"

14          The agents' response to his statement is

15    completely appropriate.  They are confirming what he is

16    confirming, that one of those rights -- and they are

17    acknowledging the fact that he can dictate the direction of

18    the conversation.  He doesn't attempt to do that later.

19          And, Your Honor, I would also like to spend some

20    time -- there is a lot of attention about that first hour

21    and that first hour about how he was silent until he was

22    overborne.

23          And I think if you look at the video and the

24    transcript of what happened, that is completely false from

25    what happened in that first hour.

         1          The first 14 minutes of that hour he was alone in

         2     the room.  So there is certainly nothing that can be read

         3     into his silence.

         4          From Minutes 14 through 20, he was completely

         5     engaged with the agents answering biographical questions

         6     that included a lot of information that required coherence.

         7     He was asked about numbers.  He was asked about addresses.

         8     He was asked about phone numbers, and he had zero hesitation

         9     of his ability to answer those questions.

        10          And then from Minutes 40 to 60, he is asking

        11     questions of the agents.  He is not sitting there silently.

        12     He is engaging.  He is trying to determine what it is the

        13     agents already know.  So at most he was silent for 20

        14     minutes --

        15          THE COURT:  But Mr. Nicolaysen will argue this was

        16     all part and parcel of the tactic that law enforcement was

        17     using to stretch this out, you know, in the -- my old job at

        18     LAPD they used to say, time, talk, and tear gas in the case

        19     of a barricaded suspect.  Just take our time, talk with him,

        20     and over time they'll break down and give us what we want.

        21          MS. KUPERSMITH:  I think, Your Honor, the video

        22     shows that the agents were extremely patient, they were

        23     extremely calm, and they were giving Mr. Brinson the

        24     opportunity to decide whether or not he wanted to

        25     participate in the interview.

1          The way Mr. Nicolaysen makes it out is the agents

2     would have been left with no option.  If they were

3     constantly pounding on him to make statements and telling

4     him repeatedly rather than giving him moments of silence, I

5     am sure we would have heard that argument as well.

6          The way the defense is presenting this is that no

7     one who has ever been arrested before could make statements,

8     no one who was a minority could ever make statements, no one

9     who doesn't have any guilt or anxiety about what they've

10    done could ever make statements, no one who is stressed

11    about being caught after knowing what they've done and

12    specifically knowing that the agents know what they have

13    done could never make statements.

14          THE COURT:  What's your response to -- you heard

15    Mr. Nicolaysen talk about and show the photos that he would

16    argue are, sort of, the agonizing photos -- there is a

17    physical deterioration that's going on and that demonstrates

18    the tactic -- that supports the tactic that the law

19    enforcement was using to try to, for lack of a better term,

20    break him and make him talk.

21          MS. KUPERSMITH:  I would argue, Your Honor, that a

22    lot of what we're seeing, the physical symptoms there are

23    self-imposed.  They are not the result of any government

24    coercion.  They were result of -- and even Mr. Brinson in

25    his letter support this, the fact that he -- there is a lot

```
 1   made about the word "compelled."
 2           But there is a big difference between
 3   self-imposed, feeling compelled by the presentation of
 4   evidence against you, and government coercion forcing
 5   statements.
 6           THE COURT:  Right.  But in fairness, it is
 7   interesting.  Look.  The government is doing what it thinks
 8   it needs to do.
 9           The letter, in some ways doesn't move -- one might
10   argue doesn't move the needle at all because Mr. Nicolaysen
11   raises a valid point.  "Compelled," what does that really
12   mean?
13           You could argue he felt forced to do it.  And
14   maybe he felt forced to do it because the jig was up or
15   maybe he felt forced to do it because of law enforcement.
16           But my point in saying this is that the letter,
17   one might argue -- well, I guess I wonder whether how much
18   weight to give to that letter at all given the other
19   evidence that's in play.
20           MS. KUPERSMITH:  That's fine, Your Honor.  Even
21   without the letters I think the government meets its burden
22   that this motion should be denied based on just the case law
23   itself that talks about the levels of what is seen in these
24   videos compared to what Ninth Circuit and Supreme Court have
25   already evaluated in terms of a defendant's sickness or a
```

1   defendant's will being overborne.  Even without the letters

2   he doesn't rise to those circumstances.

3          THE COURT:  Couldn't an argument be made that the

4   time in that room, the five -- some close to five hours,

5   lends itself to allowing someone's will to be overborne?

6          MS. KUPERSMITH:  I don't think that's what the

7   case law supports.  I mean, you have the Thompkins case from

8   the Supreme Court which held the defendant implicitly waived

9   his right to remain silent by participating in an interview

10  when he was silent for two hours, 45 minutes before talking.

11         Here we're talking about maybe 20 minutes.  I

12  think the length of the interview, the agent's tactics that

13  are completely visible show a patient -- show offered

14  breaks, offered water.  He wasn't physically constrained in

15  any way.

16         There is a point -- I believe it's on the third

17  segment of the video where he is left in the room alone and

18  he is walking around.  He is not showing any signs of

19  physical illness.

20         He makes that one comment of feeling like he is

21  going to vomit.  He is not physically constrained.  He can

22  completely get up.  He is offered bathroom break.  He is

23  offered water multiple times.  He is offered other drinks.

24  It just doesn't rise to the level of what the case law is

25  showing.

1    There is cases that we cite in there about a

2    heroin addict going through withdrawal, and that's not found

3    to be that his will is overborne.  There is international

4    flights after being not sleeping and their will is not

5    overborne.

6    In this case he is brought in, he is able to

7    coherently answer questions, and it is not until after the

8    presentation of the evidence against him where he is

9    deciding to give back to the agents.

10    And I think the narrative that's played out in the

11    videos and the -- if the Court is going to read anything

12    into the letters, we just say that it supports what we see

13    in the videos as a completely different reality than what

14    the arguments defense counsel is making through their motion

15    and through the affidavit that this turning -- turning what

16    is self-imposed guilt and feelings of being caught and being

17    presented with the evidence against him is what's compelling

18    him to talk at that point or what's making him to decide to

19    talk at that point.

20    And it is not any type of government coercion.

21    These agents were extremely patient with him, and the

22    periods of silence that are being turned into a

23    blitzkrieg-like attack is just hyperbole at this point.

24    It doesn't bear out of what happened in that

25    video.  It was giving Mr. Brinson plenty of time to decide

 1   how he wanted to direct this interview.

 2          Just because he decided to partake in the

 3   interview doesn't mean that that should get suppressed, and

 4   that seems to be what defendant's argument is, is that,

 5   because he was there a long time and he decided to make

 6   statements, that that should be suppressed.

 7          THE COURT:  Thank you, Ms. Kupersmith.  I

 8   appreciate it.

 9          Mr. Nicolaysen, I will give you a brief

10   opportunity to respond, but I do want to shift over to the

11   next motion.

12          MR. NICOLAYSEN:  I get that.

13          Well, the government and I see two very different

14   videos especially in the first hour.

15          But to the extent the government would have the

16   Court believe the agents were courteous and, quote/unquote,

17   extremely patient and, quote/unquote, the agents were calm,

18   that's all part of the tactic.  That's not a positive that

19   weighs against.

20          THE COURT:  As it relates to that point though,

21   law enforcement can use tactics.  And to be fair, this is

22   not like a Netflix movie "When They See Us."

23          They're not like beating down on an individual.

24   They're taking their time, which is a tactic.

25          MR. NICOLAYSEN:  When terrorist suspects are being

```
1    interrogated at black sites, these tactics are used all the
2    time.  It's not physical aggression, and it's a wearing down
3    process.  When you have someone who has never been in that
4    situation before and is absolutely terrified, it's all about
5    wearing down --
6             THE COURT:  But is the standard an objective
7    standard or subjective because it seems like you are saying,
8    because your client was inexperienced, never been in this
9    process, that the standard should shift or be different.
10            MR. NICOLAYSEN:  It's very specific to the nature
11   of the interrogation and the suspect himself.  There are no
12   black and white rules.
13            But after he invokes his assertion, "You said I
14   could have a lawyer," and the agents essentially blow him
15   off as we've already discussed and they put the burden back
16   on him, and then the agents redirect the discussion -- and
17   that concept is in my papers -- it's very important.  The
18   agents just redirect the conversation away.
19            That does something to you psychologically because
20   you have already said, "You said I could have a lawyer," and
21   there is no Velcro.  The agents are not engaging, they're
22   blowing you off.  That has a tremendous effect on you.
23            Here we have, when the government says the agents
24   offered him breaks and offered him water, that just is a
25   complete mischaracterization.  My papers discuss at length
```

```
 1   the point where Mr. Brinson points out he is ready to vomit
 2   and he asks for the trash can to vomit in.  And as a clear
 3   tactic of coercion the agents refuse his request, and they
 4   basically say, "Get it yourself."  So instead of offering
 5   him a rest break or --
 6           THE COURT:  Mr. Nicolaysen, "Get it yourself," is
 7   not like it's go outside and go to CVS and get a garbage
 8   bag.  There was a can in the room.
 9           MR. NICOLAYSEN:  But we have to again put
10   everything in context.  We have just listened to government
11   counsel paint this picture of diplomacy and respectfulness.
12   It's anything but.
13           And by the time this vomiting issue came up, it
14   was very late in the one-hour period.  We're starting to see
15   physical manifestations of illness.  And that's where
16   Brinson breaks at the one-hour point.  It's a state --
17   everybody in this courtroom would go through that.
18           We just tend as lawyers to talk about things a
19   little too abstractly.  So we don't see the true nature of
20   the control and the wearing down and what human beings go
21   through.
22           These agents were very, very shrewd when they say
23   to him, "It's Day 1.  You have got to push forward."  That's
24   a quote.  And he's already said, "You said I could have a
25   lawyer."  "It's Day 1.  You have got to push forward."
```

 1   They'll have none of his legal rights.  They want

 2   information.  That does something to you.

 3          So we can't get caught up in these kind of

 4   formulaic approaches under the Davis opinion and others.  We

 5   have to look at the dynamics of what happened in that room.

 6          I do ask, Your Honor, if the Court has the time,

 7   look at that first hour or at least pieces of it because you

 8   see the agregation of the stress, and the agents' so-called

 9   calmness is a very calculated calmness that is every bit of

10   stress-inducing as actual beating.

11          So my judgment, Your Honor, these statements

12   should be suppressed.  The Government's overreached.

13          I understand Your Honor wants to move on to the

14   next motion.

15          THE COURT:  The motion to suppress the physical

16   evidence.

17          MR. NICOLAYSEN:  Yes.

18          THE COURT:  On this one, Mr. Nicolaysen, wrong or

19   right, you have done this a long time.  It strikes me there

20   is more than abundant probable cause.  And moreover, the

21   Vehicle Code is a thick book, and this evidence would have

22   been discovered in any event for a whole host of reasons.

23          I'm not sure it was even necessary to go through

24   the analysis, but the car is parked the wrong way, the car

25   likely would have been towed.

```
 1            It just strikes me -- again this is one of those

 2    that I think is a bit of an uphill climb to suppress the

 3    evidence, but I want to hear from you on this point.

 4            MR. NICOLAYSEN:  I thank the Court.  As the Court

 5    knows, I briefed the issue at length.  So let me just do

 6    some highlights.

 7            First, the government has done what I call a

 8    bait-and-switch.  In their law enforcement forms, it is

 9    treated as a vehicle impound and an inventory search, and it

10    is characterized as such in the reports of investigation and

11    in Agent Kwong's affidavit for the search warrant.  It has

12    always been an inventory search.

13            And we know inventory search procedures.  First,

14    there has to be a valid impoundment.  And once the valid

15    impoundment has been done -- and that means you are at the

16    tow yard essentially -- then the inventory search is

17    conducted.  It's not designed for rummaging -- and that's a

18    term of art.  It's discussed in my papers -- to go hunting

19    for incriminating evidence, which is what happened here.

20            In the government's opposition, lo and behold --

21    it's like Casablanca.  I am shocked and horrified -- now we

22    start seeing other legal theories popping up, and I think

23    it's because the government realizes the lack of

24    sustainability of the inventory search theory.

25            Now we see plain view.  Oh, the agents saw the
```

```
1    blanket and the handbag containing the laptop in plain view,

2    and attached to one of the agent's declarations is the photo

3    of Mr. Brinson's vehicle.

4            And when we look at this vehicle photo, we see

5    tinted windows and we see a design that means the only way

6    there could ever be plain view -- and I highlight plain view

7    is nowhere to be found in the search warrant affidavit or

8    reports of investigation ROIs.  But anyway, they argue plain

9    view.  That's not a vehicle that lends itself to plain view.

10   From the outside you can't see it.

11           THE COURT:  Is that fair, though?  Because I

12   thought there was some dispute about, you know, did they see

13   it as he was getting to the car with the car door being

14   opened?  Maybe I'm wrong on that.  Are you saying the plain

15   view was through these tinted windows?

16           MR. NICOLAYSEN:  It would have to be.  But

17   Mr. Brinson was not allowed to get back in the car.  And why

18   would the agent --

19           THE COURT:  That's my point.  He wasn't in the car

20   when he was arrested.  Right?

21           MR. NICOLAYSEN:  He is outside on the street, and

22   that takes us to one of the misrepresentations in

23   Agent Kwong's search warrant affidavit where she states the

24   car was stopped.

25           And the reason that she states the car was stopped
```

1   is because under the Vehicle Code, which is 22651, that is

2   the standard under California law for -- one of the

3   standards, not the only standard -- for conducting an

4   inventory search.  Again, these are in my papers.  I'm just

5   highlighting this.

6          So we have Section (h)(1) which among the listed

7   criteria where the peace officer can do the impound -- and

8   it says when an officer arrests a person driving or in

9   control of a vehicle.

10          Well, Mr. Brinson was neither.  He was walking

11   back to his car.  And Agent Kuzma's report of investigation

12   does admit that, but that doesn't work with this Vehicle

13   Code Section 22651.

14          He is neither driving or in control.  So what

15   Agent Kwong said which was a flat-out lie -- I am sorry I

16   have to say this on the record -- in her search warrant

17   affidavit was the vehicle was stopped.  This is in my

18   papers.

19          That's why I am asking for a Franks hearing.

20   That's just the tip of the iceberg.  What we have now in all

21   of these affidavits is sort of this confused mishmash of,

22   well, when did this so-called impoundment occur?

23          Now the government says, well, the impoundment

24   occurred actually at the curb site because the government

25   knows the Vehicle Code section wasn't complied with.

```
 1          So now they redefine the events of the
 2   impoundment.  They say, The impoundment occurred right there
 3   on the street, and that's when the evidence was taken out by
 4   the sheriff's deputy who did the impound report and she puts
 5   that same Vehicle Code section down on her report, not
 6   realizing that it doesn't apply.
 7          All of a sudden now the impound didn't occur --
 8   the impound occurs on the street before any towing is done
 9   because the government realizes now that Vehicle Code
10   section was not complied with.
11          Well, the Fresno officer wants to help the
12   government.  So in her papers she says, Well, that's okay.
13   There is another Vehicle Code section that would have
14   allowed the impound, and that's Vehicle Code
15   Section 22655.5.
16          And removal of vehicles used in crime or liens --
17   and I have yellow highlighted here subsection B -- "When any
18   vehicle is found upon a highway or public or private
19   property and a peace officer has probable cause to believe
20   that the vehicle itself" -- I'm sorry, "that the vehicle is
21   itself evidence which tends to show that a crime has been
22   committed or that the vehicle contains evidence which cannot
23   readily be removed."
24          Well that, "which cannot readily be removed,"
25   we've seen many of these cases with secret compartments in
```

```
 1   vehicles, and that requires special equipment at the police

 2   yard.  You are not going to be using blow torches to get

 3   into the secret utility compartments on the street.  This

 4   provision says you can impound those types of cars.

 5         But that's not this case.  This case -- and the

 6   declarations are clear -- it's all about going in and

 7   grabbing everything.  The agents took the laptop and took

 8   the blanket right there at the street before the car got

 9   towed.  That's not evidence which cannot readily be removed.

10   Nothing can be more readily than what happened here.

11         And the Fresno sheriff detective said, "The car

12   itself is evidence, and we may want to take DNA from the

13   car."  That's just nonsense.  There has never been DNA taken

14   from the car, and the car itself is not evidence of

15   anything.

16         So it's all contrived.  It's an attempt to put a

17   circle in a square in opposing my motion because technical

18   as the motion may be -- and these inventory search motions

19   are technical -- the government simply was perhaps a little

20   too hasty in what they did.  Perhaps they never thought they

21   would be challenged in a suppression motion.

22         So Brinson is stopped as he is walking to the car.

23   He is not driving or in control --

24         THE COURT:  Is the car door open?  What's your

25   position?
```

```
 1           MR. NICOLAYSEN:  My position is the car door is
 2  not open.  I would want an evidentiary hearing on that.
 3  It's too contrived.  It's almost like a screenplay.
 4           It's -- I hate to impugn the integrity of law
 5  enforcement, but the problem is in these cases -- and I know
 6  members of the public are here -- these are very emotional
 7  cases.  The agents put their heart into these cases.
 8           And all of us in society, actually just stepping
 9  outside of my role as defense counsel, but I have children
10  too.  We all appreciate and respect that, but the rules are
11  the rules and process is process, and we can never allow the
12  nature of the charges or the emotional impact those charges
13  have -- and I can only imagine how the families feel -- to
14  override our commitment professionally to the adherence to
15  process.
16           And here process was completely circumvented by
17  overzealous agents who just saw that car and did whatever
18  they needed to do to get in and grab what they wanted.
19           And then they try to clean it up in opposing this
20  motion because impounding was not properly done, which means
21  you can't get to Step 2, which is conducting an inventory
22  search, which is what they told the issuing judge for the
23  warrant, which is what they wrote in their reports.
24           Now we say in plain view.  Now we're scrambling,
25  the government is scrambling.  One of the reasons I want the
```

1   Franks hearing -- and I will conclude my remarks by simply
2   asking for the hearing.  I am not asking for a ruling on the
3   merits on this motion.  I don't ask for the hearing on the
4   statements motion.  Your Honor has the evidence.
5           But here we have so many non-committal assertions
6   in Deputy Veneman, the Fresno deputy in her declaration,
7   Agent Kwong, Agent Kuzma, the search warrant affidavit.
8   Nobody wants to take responsibility for who actually took
9   the items out of the car or when exactly it was taken out of
10  the car.
11          And when we start tracking all of these details,
12  we start hearing the little children's story of the little
13  red hen.  Who took those items?  Not I, said the little red
14  hen.  That's this agent.  I was there.  I observed an
15  inventory search was conducted.
16          Suddenly the government uses the past tense
17  because, if you use the active tense in grammar, you need a
18  noun, and you need to identify who did it.  They're not
19  going to do that one.  So they're being very coy in being
20  non-committal and imprecise because they blew it.  They
21  clearly violated the inventory search process.
22          Somebody -- and I appeal to Your Honor's
23  tremendous experience before taking the bench and
24  supervising and being in charge -- somebody, in my opinion,
25  was told by a supervisor who reviewed these matters that

```
 1   same day and said, "You better go get a warrant because I am

 2   not inspired by the way things were done without a warrant."

 3        And so by -- these events happened between

 4   10:00 and 11:00 A.M.  By 4:00 o'clock that same day a

 5   warrant is obtained.  Why?  Why?  If they're so confident

 6   legally that the warrantless search was proper, why?  Well,

 7   look at the warrant application.  It raises its own

 8   problems.

 9        There was an awareness of non-compliance of the

10   Vehicle Code.  That probably was one of the comments made by

11   a supervisor.  "You don't have a valid inventory search."

12        So in the affidavit this statement is a

13   misrepresentation -- the vehicle was stopped.  It wasn't

14   stopped.  It was parked on the street.  The vehicle was

15   stopped.  That would be what the Vehicle Code says if he is

16   driving or if he's in control like he's behind the steering

17   wheel.  That was the impression conveyed in the search

18   warrant affidavit -- is flat-out misrepresentation.

19        So we need a hearing.  We really do.  I want to

20   get these agents up there, and I want to get some clarity,

21   and I think we'll find there was a recognition even on that

22   day that the impound, slash, inventory search standards were

23   not complied with.

24        THE COURT:  Let me ask you this:  Let's assume for

25   the sake of this question that everything you say is
```

 1    accurate.

 2          The government also responds by saying, look, this

 3    car was going to get towed no matter what.  It was parked on

 4    the wrong side of the street.  That in and of itself is a

 5    Vehicle Code violation that would have resulted in its

 6    impoundment and, therefore, they would have found these two

 7    items in any event.

 8          MR. NICOLAYSEN:  But the inevitable discovery rule

 9    is not going to be their safety valve here.

10          THE COURT:  Why?

11          MR. NICOLAYSEN:  Because it doesn't allow this

12    violation to be excused.  We -- for example, there is

13    nothing about inevitable discovery in the reports of

14    investigation or in the search warrant affidavit.

15          The search warrant affidavit is a very compelling

16    document because it doesn't teach the issuing judge any

17    perspective that the government now is arguing in an attempt

18    to defend the motion.

19          Everything the government says in opposition to my

20    motion should have been in that search warrant affidavit.

21    Agent Kwong should have been candid with the issuing judge.

22          The government may or may not have complied

23    technically with the impound, slash, inventory search, but

24    we maintain inevitable discovery regardless of any violation

25    for the following reasons.

```
 1            Deputy Veneman is their safety valve here.  She is
 2   the one who shows up now in this opposition and says, "I was
 3   going to tow the vehicle any way.  It was parked on the
 4   wrong side of the street."  Why?  That's her talking.  They
 5   don't cite a specific rule.
 6            Let me just take a moment.  I realize I am taking
 7   up time.  One more citation here if I may.
 8            Here we are, the Fresno policy.  Fresno Sheriff
 9   Department policy.  It's an exhibit to Deputy Veneman's
10   declaration; so I am not introducing anything new.  This is
11   actually part of the government's opposition.
12            THE COURT:  Right.
13            MR. NICOLAYSEN:  Goes to the inevitable discovery.
14   So here is the Fresno Sheriff Department impound policy.
15            Impounds, subsection (b)(1), quote, "Only vehicles
16   used to commit a crime and needed as evidence are to be
17   impounded," period.  "All others are to be stored," period,
18   unquote.
19            Government doesn't say this is a storing.
20   Government says it was an impound.  What happened here is
21   not consistent with the Fresno Sheriff Department Policy on
22   impounds.  It's not.  And Your Honor knows the community
23   caretaking exception.
24            It's all about compliance with police department
25   policies.  And we have a policy from Deputy Veneman's
```

1   department, which is not satisfied here.  The vehicle was

2   not used to commit a crime, and the vehicle was not needed

3   as evidence.  Those two things are clear.

4          This vehicle has no relevance to the government's

5   case in chief.  It's just a vehicle that he drove.  They

6   drove to that house.

7          Government counsel will tell you that my client

8   brought the young child back home.  I get it.  And so the

9   vehicle is aiding and abetting that?  Come on.  That's not

10  what this impound policy is about.  This vehicle is not used

11  to commit a crime, and it is not needed as evidence.

12         Therefore, applying the community caretaking

13  standard which is required by law, there is no compliance

14  with the policy on impounds of the department at issue, end

15  of discussion.  The government cannot treat this properly as

16  an inventory search because no valid impound was conducted,

17  and that is a condition precedent to the inventory search

18  itself.

19         What we do have, as I argue in my papers, is

20  rummaging.  The agents were just so eager to get into his

21  car right there at curbside they basically lost perspective,

22  probably thought they would never be held accountable in a

23  suppression motion, and grabbed what they thought might be

24  relevant.

25         And when we see the inventory report that the

```
 1   deputy filled out, the actual inventory report -- here it
 2   is.  Last one.  I know we're pressed for time.  I do
 3   understand.
 4             This is Exhibit E to my motion.  This is the
 5   Fresno Sheriff Department vehicle report.  Once the vehicle
 6   was towed to the tow yard, Deputy Veneman filled this out,
 7   and it says 11:30 A.M.  That really tells me -- and I wrote
 8   the motion with this understanding -- that this form was
 9   filled out at the tow yard.
10             "Oh, no," says Deputy Veneman.  "We filled it
11   right there at curbside."
12             That's nonsense because Agent Kwong's report
13   states that the -- Agent Kwong's report -- this is agent
14   Kwong's report here, Exhibit C to my motion, points out that
15   the laptop, which is critical evidence in this case, was
16   taken from the car at 10:45 at curbside.  They're not
17   standing there for 45 minutes.
18             But when we go back to the actual inventory report
19   here by the deputy, which I am clear in my mind was done at
20   the tow yard although they deny it -- I think they're
21   lying -- first she puts 22651(h)(1) up there as the
22   Vehicle Code, the one that I discussed earlier that clearly
23   doesn't apply, and the most important thing is, boy.  Look
24   at this list of items that are inventoried there in
25   handwriting.
```

```
 1              You look at them, and nowhere in that little
 2    handwritten group of items taken from the car for inventory
 3    are the items taken by the feds -- the blanket, the laptop.
 4              That's because the feds went in right there at the
 5    street, took what they wanted, and then let the car be towed
 6    to the yard and whatever other items unrelated to their
 7    investigation were still in the car show up on this
 8    inventory.
 9              That's exactly what an inventory search is not.
10    That is rummaging.  The agents rummaged through the car at
11    this curbside, took what they wanted, and let the car be
12    towed.  This is a clear violation of the rules, Your Honor.
13              Thank you.
14              THE COURT:  All right.  Let me hear from the
15    government.
16              MS. MYERS:  I think the government's papers
17    sufficiently address the defendant's argument that were made
18    here.  I will hit some of the highlights, but I think the
19    most important thing here is that defendant or defense
20    counsel blows past the fact that there was probable cause
21    because he wants to point to small details about the
22    inventory search that he finds problematic.
23              That's not the inquiry.  The inquiry is that there
24    was probable cause.  The items were legitimately and
25    lawfully seized.
```

1          The defense counsel has submitted no declaration

2     from defendant, and his claims that the agents were lying is

3     based on his pure speculation, defeats sufficient grounds

4     for a Franks hearing.  Additionally, the things that he

5     claims were lies, quote/unquote, in the affidavit aren't

6     even relevant to the determination of probable cause.

7          Therefore, the Court should deny defendant's

8     motion, deny their request for a Franks hearing, and deny

9     the motion to suppress.

10          Most importantly here there was probable cause to

11    search Defendant Brinson's vehicle.  The photographs that

12    were taken that are submitted with the government's papers

13    document what happened that day.

14          There is no conspiracy to cover up and open up

15    defendant's door.  He was observed parking in front of the

16    victim's mother's house and carrying a victim that law

17    enforcement had identified earlier that day, into the

18    premises, returning back to his vehicle.

19          At that point in time his car was blocked by

20    Agent Kuzma's car as explained in the declaration.

21    Agent Kuzma had him move away from the car, and Agent Kuzma

22    couldn't remember whether Brinson was in the car or just at

23    the car.  And we don't know because defendant didn't submit

24    his own declaration, but the photographs taken therein

25    showed that the property that was removed from his person is

1    right near the car.

2           Additionally, defense counsel now argues that we

3    are manufacturing a plain view argument and a probable cause

4    argument, and that is not the case.

5           As documented in Agent Kuzma's ROI, which is

6    submitted as government's Exhibit D at page 72 and 73, it

7    relays the fact that Agent Kwong saw these items in the back

8    of defendant's car at the time.

9           Moreover, as attached to Agent Kwong's

10   declaration, Exhibits 5 and 6, they are photographs of what

11   agents saw that day in defendant's car.  And, yes, his

12   windows are tinted, but they are not opaque, and the car

13   door was open.  And you see in Exhibit 5 to Kwong's

14   declaration, Agent Kwong's declaration, that you can see the

15   blue and white Dallas Cowboys blanket in the defendant's

16   back seat along with the laptop bag.  That's Exhibits 5 and

17   6, Your Honor.

18          At that point in time we don't need to indulge in

19   this inventory search inquiry because, as long as there is

20   probable cause -- and that's with the entire line of cases

21   that go into the inventory search inquiry -- as long as

22   there is probable cause, it's the end of the story.  You are

23   allowed to conduct a warrantless search of the vehicle, and

24   we are well in access of the probable cause standard here.

25          It wasn't there was a fair likelihood that

1    evidence of Defendant Brinson's crimes would be recovered

2    from that vehicle.  They saw evidence of the crime.  They

3    saw the Dallas Cowboys blanket that was in the child

4    pornography that Defendant Brinson had produced that they

5    had learned earlier that day was a blanket that had been

6    given to him by the victim's grandmother at Christmastime,

7    and the blanket in the back seat of the car is an identical

8    match.

9            Additionally, there is a laptop bag.  We know that

10   this defendant, the online producer of child pornography, is

11   using a computer -- he is using digital devices to both

12   record the acts of sexual abuse and then upload them to the

13   Internet.

14           They didn't see a laptop.  That's for sure, but

15   they saw a laptop bag, and it is more than a fair

16   probability to anticipate that there would be a laptop in

17   that laptop bag.

18           At that point in time, law enforcement officers

19   had probable cause to search the vehicle and to search for

20   evidence of the crime that they had reason to believe

21   defendant had committed, which included recovering the

22   packets of placards from the CP the defendant had produced

23   which were in the laptop bag.

24           At that point in time the Court really needs to go

25   no further.  Now, we provided declarations because I think

1    it was a little bit unclear from defendant's motion what

2    exactly happened that day, and I think the declarations make

3    clear exactly what happened.  There was probable cause.

4    Even if there wasn't probable cause, there was a valid

5    inventory search.

6           There was a case that has been published since the

7    government has filed its opposition, and that's

8    United States versus I think it's pronounced Garay, and it's

9    from the Ninth Circuit, it's an inventory search case, it's

10   Number 18-50054, 2019 WestLaw 4419679.

11          And in that case, Your Honor, the government -- or

12   the Ninth Circuit upheld an inventory search.  The defendant

13   had led the police officers in that situation on high-speed

14   chase and then crashed his car in a ditch.  The Ninth

15   Circuit said because -- quote, "because the site was in

16   effect a crime scene, the items in the car were sensibly

17   treated as evidence."

18          THE COURT:  Are you arguing in this case was the

19   car a crime scene by virtue of seeing Mr. Brinson with a

20   victim, or what's the analogy?

21          MS. MYERS:  Yes, Your Honor.  One, because the

22   defendant had been in the car and then used it to transport

23   a victim and that there was evidence of the crime in the

24   car.

25          And I think that goes to the argument that that is

 1   why Detective Veneman had it stored inside and for evidence

 2   is because at the time what they knew was defendant was

 3   sexually abusing the victim that he had transported in that

 4   vehicle.  They didn't know if he had abused the child in the

 5   car, but if he had, there might likely be DNA evidence in

 6   the car which would render it as part of a crime scene.

 7           THE COURT:  You are saying this was an inventory

 8   search.  You heard Mr. Nicolaysen argue this was more of an

 9   impound search.  What's your response?

10           MS. MYERS:  I don't know that there is a

11   difference that makes a legal import here.  As

12   Deputy Veneman explained, she was either going to tow the

13   car for impound or tow the car for storage.  She could not

14   leave it there.  It was parked incorrectly.  It was -- the

15   defendant had been arrested, and it was his car.

16           THE COURT:  Family members or other individuals

17   that were going -- either became aware or were going to

18   become aware of what this issue was.

19           MS. MYERS:  Yes, and the car was parked directly

20   in front of their house; so it couldn't be left there.  And

21   whether she is towing it for storage or whether she is

22   towing it for impound, an inventory search has to be

23   conducted, and that's within the policy that is attached to

24   our exhibit and the same policy that defense counsel cited

25   today.

```
 1              So we have one inevitable discovery argument, and
 2   that brings us to the affidavit which defense counsel makes
 3   much of the fact that our agents are so caught up in the
 4   nature of the crime that they are willing to bypass crucial
 5   procedures.
 6              And I would submit that that's the exact opposite
 7   of what happened.  Our agents know the stakes.  They know
 8   they have to get it right.  They know that they are going to
 9   do everything they can to preserve the evidence and do it
10   carefully so that the defendant can't prevail on a
11   suppression motion.
12              And I would submit that the affidavit in support
13   of the warrant is a belt and suspenders efforts by the
14   agents to make sure they can dot every I and cross every T
15   in terms of maintaining the evidence.
16              Moreover, the statements that, you know,
17   defendant -- defense counsel claims are, quote, "outright
18   lies," close quote, have nothing to do with the
19   determination of probable cause.
20              I see Your Honor seems to appreciate the arguments
21   here.  I think that I have addressed the points that defense
22   counsel has raised.  So unless you have further questions, I
23   will submit, Your Honor.
24              THE COURT:  Thank you.  I appreciate it.
25              MR. NICOLAYSEN:  May have a moment, Your Honor?
```

```
 1              THE COURT:  Briefly.  We're coming up on two hours
 2   here.
 3              MR. NICOLAYSEN:  I understand.
 4              Your Honor, I respectfully disagree that the
 5   automobile exception which is the doctrine by which a
 6   warrantless search of a vehicle can be done applies here.
 7              We all know the doctrine.  If the officers have
 8   probable cause to believe that the vehicle contains
 9   contraband, fruits of an offense, they can search the car.
10              We've seen that repeatedly with surveillance teams
11   that see events where suspects in an ongoing drug
12   investigation go to a house they think is a stash house,
13   come out of the house, get in the car, surveillance team
14   radios to a black-and-white to conduct a traffic stop, there
15   is probable cause to believe there is drugs and the drugs
16   are seized from the car.
17              But here there was no antecedent events leading up
18   to this arrest of Brinson --
19              THE COURT:  Is that fair to say given the nature
20   of the allegations here?  They see Mr. Brinson with a
21   alleged victim.  Okay?  They don't know where they've been,
22   what they've done, or what they're about to do.
23              Based on the charge, is it not unreasonable for
24   the officers to believe that there may, in fact, be evidence
25   of a crime contained in that vehicle?
```

1          MR. NICOLAYSEN:  I think they are two completely
2     different concepts, and the location was under surveillance.
3     There was some surveillance, but it was not the type of
4     surveillance that would segue with the automobile exception
5     where you are seeing criminal activity happening and then
6     that criminal activity now is linked to the vehicle.
7          THE COURT:  I get it's not the same as your
8     drug --
9          MR. NICOLAYSEN:  But that's a classic application
10    of automobile exception.  Surveillance sees criminal
11    activity, criminal activity then on a continuance basis that
12    afternoon, evening is now linked to that vehicle, probable
13    cause --
14         THE COURT:  But that's not the only example of an
15    automobile exception.
16         MR. NICOLAYSEN:  But it's a useful one here
17    because here there is no evidence of criminal activity
18    linking to the vehicle such that the vehicle would have
19    evidence of a crime.
20         I agree that there is serious cause for concern --
21    he's bringing a boy back to the house.  We get it.  And law
22    enforcement was already aware of that location and proceeded
23    to do interviews.
24         But the presence of a child -- he is taking the
25    child back in the house -- is distinct and separate from

```
 1   whether contraband is in the car itself.
 2             This is not that type of crime unlike a drug case,
 3   for example, where you would see a correlation between the
 4   presence of a child in the passenger seat is now being taken
 5   out of the car and brought home and the presence of
 6   contraband in the car, Number one.
 7             So the automobile exception doesn't apply, and I
 8   emphasize that neither the reports of investigation nor the
 9   search warrant affidavit makes any reference to that
10   theory -- in other words, is a theory that was created
11   during this litigation by the U.S. Attorney's Office to
12   oppose the motion.
13             That's very important because the agents always
14   characterize this in the search warrant affidavit and the
15   reports as an inventory search, which it is not.
16             The government says the car was a crime scene.
17   I'm sorry.  It's not a crime scene.  The recent case that
18   just came down, Garay from the Ninth Circuit, there you have
19   a high-speed chase, you have events leading -- it's exactly
20   what I way just mentioned.  You have criminal events leading
21   up to the taking of the car, and the car itself is the
22   crime, the high-speed chase committed by the car.  The car
23   committed the crime.
24             So now the car itself, going back to the inventory
25   search standards where the car is evidence of the crime and
```

1    the car now itself as a vehicle becomes the crime scene, we

2    don't have that here.

3         We have Brinson driving up to the curbside,

4    getting out of the car with the child, bringing him in the

5    house -- that's not a crime scene.  So the Garay case simply

6    doesn't apply.

7         And the last thing in regard to inevitable

8    discovery -- and this is my final point because I know we're

9    pressed for time, but this is very important in terms of --

10   the government -- the agents had to go inside the car and

11   take the bag containing the laptop out of the car and open

12   that bag and look in, and there is a laptop.

13        So the laptop is not plain view, and there was no

14   basis whatsoever for probable cause to believe that a

15   digital device would be in that car.

16        The agents had to --

17        THE COURT:  I have to stop.

18        MR. NICOLAYSEN:  Sure.

19        THE COURT:  You are saying that the law

20   enforcement seize a computer bag.

21        MR. NICOLAYSEN:  Seize a bag.

22        THE COURT:  I think they said computer bag.

23        MR. NICOLAYSEN:  The government is all about

24   characterizations.

25        THE COURT:  If they say it's a bag, given the

1   nature of the crime, it's not reasonable for them to assume

2   or think that that bag might contain a computer given again

3   the nature of this crime.

4          MR. NICOLAYSEN:  In order for them to get to the

5   point where they would see the bag and look in the bag, the

6   agents would have to be in the car.

7          THE COURT:  But wait a minute, Mr. Nicolaysen.

8   Let's just be fair here.  I get you're vigorously defending

9   your client.  I don't think you can say that, in order to

10  see the bag you have to be in the car.  I saw the photos.  I

11  mean, it's a tint.  Don't get me wrong.  But you can see

12  through the tint.

13         And, secondly, assuming the government is accurate

14  and the door is open, you can see inside the car.

15         MR. NICOLAYSEN:  You see a bag, and that's all you

16  see.  So there is no plain view.  And by the time the search

17  warrant application was submitted at 4:00 P.M. that day -- I

18  don't care what the government says.  Those agents had

19  already gone through the evidence, and they probably didn't

20  get into the computer -- maybe yes, maybe no -- in terms of

21  passwords, that could very well be.

22         But the application for the search warrant --

23  okay? -- was tainted.  It was already corrupted by the

24  government's knowledge of the evidence in the car.  So it

25  was -- they wrote the application after the fact.  You can't

```
 1   call it inevitable discovery.
 2            So this is the type of circumstance where the
 3   Court should not allow the government to clean it up after
 4   the fact.
 5            The only reason they applied for the warrant was
 6   because somebody somewhere, the agents or their supervisors,
 7   said this is not a sustainable warrantless search.  We need
 8   to clean this up.  And they apply for the warrant, and they
 9   make a false representation in the warrant to suggest that
10   impounding was lawful when it was not, and they already know
11   the evidence.
12            You know, when you apply for a warrant, you are
13   not supposed to know the evidence, but they -- here you have
14   probable cause to believe, they're saying we have probable
15   cause to believe about something they already have.  And
16   that is a direct contradiction of the analysis on probable
17   cause.  They should never have had that evidence in their
18   possession by the time they applied for the warrant.
19            So the warrant itself does not resolve the
20   inventory search analysis, Your Honor.
21            Let me make one last point about the statements
22   motion real fast.  There was no signed waiver.  I just want
23   Your Honor to be aware of that in the analysis of invoking
24   your right to counsel.  The agents did not present a waiver
25   form.  He did not sign a waiver form.
```

```
 1                THE COURT:  All right.  Thank you.
 2                MR. NICOLAYSEN:  Thank you, Your Honor.
 3                THE COURT:  We've been going at this now for two
 4      hours.  Why don't we take a 15-minute break, and then we'll
 5      resume with the last motion, Mr. Lawniczak's motion to
 6      sever, and then we'll go from there.  Let's take a 15-minute
 7      recess.  Have everyone come back at 20 after 12:00.  All
 8      right.  Thank you.
 9                THE CLERK:  All rise.  This Court is in recess.
10          (Recess taken at 12:03 PM to 12:26 PM.)
11                THE COURT:  All right.  I think the last motion to
12      discuss this afternoon is the motion to sever with respect
13      to Mr. Lawniczak.
14                Mr. Nishi, the floor is yours.
15                MR. NISHI:  Yes, Your Honor.  I prepared a motion,
16      and I thought I was very thorough in what I put in and --
17                THE COURT:  You were.
18                MR. NISHI:  And I have nothing additional to add.
19      I'd just be repeating myself.  So unless the Court has any
20      questions, I would submit it.
21                THE COURT:  So I have a couple of questions and
22      somewhat similar to the other motion to sever.
23                Look, he is charged with -- this is a case
24      involving a child exploitation enterprise.  The allegation
25      is that he owned the residence where this activity -- where
```

```
 1   some of this activity took place.  And there is at least an

 2   allegation that he may have been involved in the production

 3   of it in some way at the location.

 4            Does that not, for lack of a better term, sort of

 5   inextricably intertwine all these defendants for purposes of

 6   this discussion and analysis on a motion to sever?

 7            MR. NISHI:  No, Your Honor.  What distinguishes

 8   Mr. Lawniczak from the other defendants is his relationship

 9   with the Website which carries all the egregious

10   photographs, et cetera.

11            He is not part of the Website itself.  He is not a

12   member, never has been a member, never posted there.  His

13   name is totally devoid in that particular Website, and yet

14   that is the worst evidence that's going to be produced.

15            So as he is being tried for his conduct, which the

16   Court has mentioned, all this other evidence is going to be

17   coming out.

18            And that is the type of evidence that I think has

19   the major detrimental impact upon my client.  So that's

20   where the distinction factor comes in.

21            And I don't think separating him from the others

22   creates much of a judicial problem because I don't think the

23   trial will be that long with respect to Mr. Lawniczak.  The

24   evidence against him is very small compared to the others.

25            THE COURT:  I think the government might disagree
```

1  with you as it relates to the extent of the evidence against

2  Mr. Lawniczak.

3        But what about the concern or at least the

4  government's intending to introduce evidence of

5  Mr. Lawniczak's knowledge of the Website and his presence at

6  the house when the pornography is being produced and

7  perhaps -- I don't know if it will come in, but at least

8  there is an intention of the government to offer evidence of

9  Lawniczak's participation in abuse of children?

10       MR. NISHI:  That particular production, we are

11  talking about one production, and it is still questionable.

12  We are still challenging that production.

13       It's not like he is constantly doing it.  That

14  would be a different question.  But the fact that they have

15  evidence that suggests one possible contact I don't think is

16  enough to bring in the whole kit and caboodle.

17       Evidence that we would submit did occur.  It's not

18  an issue.  It's not an issue in this particular case as to

19  Mr. Lawniczak.

20       THE COURT:  But can't all this -- to the extent

21  you have concerns, can't all this be cured by a jury

22  instruction?

23       MR. NISHI:  I don't believe so.  I think this is

24  type of case that no matter what the jury -- what the Court

25  instructs, it's difficult for people to separate the

 1    prejudice in this particular case against the defendants.

 2              The pornography is such a troubling crime that I

 3    think whenever anyone hears about it, the first thing, they

 4    coil in revile and they start looking at the person saying,

 5    "How could that person have done it?"  It's not your typical

 6    kind of case.  I think in other types of crimes we often

 7    give those individuals the benefit of the doubt.

 8              I think in a child pornography, especially if they

 9    know that he knows at least one of the other participants, I

10    think the burden is placed upon him.  And I don't care what

11    instruction can be given by the Court.  I think his tarnish

12    can never be cleaned.  He is forever going to be placed

13    within that group of individuals who are going to be tried.

14              THE COURT:  Thank you, Mr. Nishi.

15              Let me hear from the government with respect to

16    this motion.  I think Mr. Nishi makes some valid points in

17    the -- again, in the scheme of things.

18              Mr. Lawniczak's involvement seems to be less than

19    the others charged, and is there a risk that, given the

20    nature of the charge, there might be a negative spillover

21    effect as it relates to Mr. Lawniczak.

22              MS. KUPERSMITH:  Your Honor, I would start just by

23    pointing out to guiding principles in the world of

24    severance.  One is that there is a very strong preference

25    indicated for the courts for joint trials.  And second is

```
 1    that disparity of volume of evidence is not grounds for

 2    severance.

 3            And I think Mr. Lawniczak in his motion

 4    significantly minimizes the connection of his charges to the

 5    other defendants.  Presuming even we separated him out, the

 6    government is still prosecuting him on his engagement in the

 7    child exploitation enterprise for Count 1 as well as his sex

 8    trafficking of a child which has significant overlap with

 9    Mr. Harrell's Count 17 of obtaining custody for the purpose

10    of producing child pornography.

11            Even the destruction of evidence charge relates

12    significantly to the text messages which indicate an

13    interest in sexual abuse of children including specifically

14    an interest of one of the named victims.  And that's just on

15    the face of the Indictment.

16            So I think it doesn't actually solve any problems

17    to sever him because there is a significant amount of

18    overlapping evidence.

19            THE COURT:  In fairness though, I guess Mr. Nishi

20    would argue that's the point.  If he is severed, even though

21    there is an overlap in evidence, he will not be on trial

22    with others and it will just be himself on trial.

23            MS. KUPERSMITH:  Yes, but that is not -- that's

24    not the standard.  The -- the standard has to be that the

25    spillover is so great that it impacts one of the substantive
```

```
 1   rights.  And in this case, it's not like Mr. Lawniczak is
 2   charged with tax fraud and the others are charged with child
 3   pornography.
 4         The evidence against Mr. Lawniczak is still severe
 5   child abuse, and the stuff that would come in is still
 6   related to Website A, still related to his knowledge of
 7   Website A or what happened to those pictures that were taken
 8   in the house and why the connection is to Website A as well
 9   as the connection of all of the relationships of these
10   defendants.
11         And so all of that is still going to be coming in
12   against Mr. Lawniczak.  And just because he may be less
13   culpable than some of the defendants is not a reason for
14   severance when you do have the strong preference for joint
15   trials and you do have such overlapping evidence.
16         And I have no doubt that Mr. Nishi will be able to
17   make the arguments to the jury of why his defendant is
18   different.  In fact that is exactly the arguments he makes
19   in that motion.  And I have no doubt the parties and the
20   Court would be able to come up with an appropriate limiting
21   instruction that does separate what evidence goes towards
22   each defendant.
23         He just does not raise the claim of why these
24   case -- why this should be separate when there is such a
25   unity of the crimes and the evidence involved in all of
```

```
 1    them.
 2              THE COURT:  If you wouldn't mind indulging me,
 3    Ms. Kupersmith, you are saying -- how many counts in this
 4    Indictment?
 5              MS. KUPERSMITH:  I believe it's 20.
 6              THE COURT:  Right.  The first Superceding
 7    Indictment has --
 8              MS. KUPERSMITH:  Nineteen.
 9              THE COURT:  -- nineteen counts.
10              Walk me through the overlap between Mr. Lawniczak
11    and the other defendants count by count.
12              MS. KUPERSMITH:  Certainly.
13              So Count 1 is pretty self-explanatory.  It's the
14    child exploitation enterprise, but I would point out
15    specifically within that count there is allegations specific
16    to Mr. Lawniczak that acts took place at his home --
17              THE COURT:  Slow down so I can get it and our
18    court reporter will get it.
19              MS. KUPERSMITH:  On at least one occasion
20    Mr. Lawniczak used a minor to produce child pornography with
21    an identifying placard that's similar to those used in
22    Website A.
23              Additionally, his connection to the child was
24    through his relationship with Mr. Brinson and Mr. Brinson's
25    connection to that child.
```

```
 1          Further, both Count 1 and Count 18 allege that
 2   Mr. Lawniczak harbored, maintained, or benefited from
 3   participation in a child sex trafficking venture involving a
 4   minor victim who was brought to Mr. Lawniczak's house
 5   because of his connection with -- between the connection of
 6   Defendant Harrell and Harrell's connection to
 7   Defendant Brinson.
 8          In that charge evidence would involve child
 9   pornography images that were produced in the house that
10   depict placards like those that Mr. Harrell and Mr. Brinson
11   used on Website A.  And that is significantly overlapped
12   with Count 17.
13          Additionally, for Count 19 against Mr. Lawniczak,
14   it relates to the destruction of text messages that are
15   between Mr. Lawniczak and Mr. Brinson and specifically
16   relate to Mr. Lawniczak's knowledge of Mr. Brinson's abuse
17   of children in that house as well as Mr. Lawniczak's sexual
18   interest in children, including the named victims that are
19   involved in Count 1, Count 17, Count -- I believe there are
20   some of the production counts as well -- Count 10, Count 13,
21   and Count 14.
22          Again, that's just on the face of the Indictment
23   itself.  So you have significant overlapping of just that.
24          And in addition, the government, since the charges
25   have been filed, there has been additional evidence and the
```

1    investigation has revealed and discovery has been provided

2    of Lawniczak's knowledge of Website A, his presence in the

3    house when other child pornography was produced, including

4    at times when Mr. Harrell was present.

5          THE COURT:  When you say -- what does "presence"

6    mean?  Presence in the house when it was being produced,

7    meaning was he involved in filming or in the production or

8    just happens to be in the home when the pornography was

9    being produced?

10         MS. KUPERSMITH:  I think some of it is unclear,

11   and some of it is going to depend on, kind of, how the

12   evidence comes out or witness statements, but there is

13   indications that Mr. Harrell and Mr. Brinson met at

14   Mr. Lawniczak's house at times and produced child

15   pornography of some of the victims together at times that we

16   know that Mr. Lawniczak was home.

17         And so there is indications, especially with the

18   text messages and the other evidence that we have, that it's

19   possible that Mr. Lawniczak was involved in that, but we

20   don't know for sure.

21         THE COURT:  Should the Court -- well, I'll just

22   ask.  Is there a possibility there will be a Superseding

23   Indictment in light of this evidence, or is this just

24   evidence that has come out during the course of your

25   preparation for trial?

```
 1              MS. KUPERSMITH:  Your Honor, it is certainly
 2    possible.  I think some of it depends on what's happening
 3    with these motions today, and what happens is kind of the
 4    ability of the parties to reach some type of resolution of
 5    this case, but there are certainly the possibility of other
 6    charges and whether that's in this district or other
 7    districts based on some of this new evidence.
 8              THE COURT:  I just want to be sure I understand.
 9              The overlap -- the counts that relate to overlap
10    are Counts 1, which is the enterprise, Count 18 about the
11    harboring children and to maintain a benefit, and Count 19
12    talks about the destruction of the text messages.
13              But your hook, if you will, is the fact that it
14    deals with destruction of text messages regarding abuse of
15    children that are named in other counts.
16              MS. KUPERSMITH:  Yes, Your Honor.
17              THE COURT:  Okay.  All right.
18              Anything further?
19              MS. KUPERSMITH:  Let me just have one moment.
20              THE COURT:  Take your time, please.
21              MS. KUPERSMITH:  So part of the other -- the
22    evidence that has been developed since the investigation in
23    this case is specifically Mr. Lawniczak's participation in
24    the abuse of one of the named victims, and that victim is
25    named in the -- several of the different counts.  He is
```

```
 1    named in Count 1 in some of the predicate offenses of that
 2    as well as Count 14, the production account that is
 3    specifically against Mr. Brinson and --
 4              THE COURT:  Uncharged conduct.  Correct?
 5              MS. KUPERSMITH:  It is uncharged except to the
 6    extent it goes to the predicate offenses of Count 1.
 7              THE COURT:  Go ahead.
 8              MS. KUPERSMITH:  The overall point is there is
 9    significant overlapping evidence with Mr. Lawniczak's
10    charges as well as the other ones.  In many cases that
11    involve co-defendants and conspiracies, there is a disparity
12    of evidence.
13              However, just the existence of the disparity of
14    evidence is not sufficient to sever specifically when you
15    have such unity of the crimes and the evidence as well as
16    the subject matter of the different crimes and the strong
17    preference for joint trials.
18              And I would just submit that there haven't been
19    any grounds upon which Mr. Lawniczak is seeking severance
20    that rises to the level that the Courts have approved.
21              THE COURT:  Thank you, Ms. Kupersmith.
22              Mr. Nishi, anything further?
23              MR. NISHI:  Nothing further, Your Honor.
24              THE COURT:  Thank you, Counsel.  All right.
25              So we've talked about a lot here.  During the
```

```
 1   recess I had a chance to try to look at some of the other
 2   evidence that has been referenced during the course of these
 3   discussions.  There is lots to go over here, and I am
 4   prepared to rule at this time.
 5           And so as it relates to -- we'll start with
 6   Mr. Harrell's motion to suppress to the statement.  I am
 7   going to deny that motion.  Look.  The government, as I
 8   indicated earlier, they do not intend to introduce any of
 9   the statements made, at least when he -- after he invoked
10   and questions that were not in response to -- responses that
11   were made -- or I should say statements that were made that
12   were not in response to any interrogation.
13           I think the evidence is pretty clear that
14   Mr. Harrell understood his Miranda rights.  Going through
15   the interview again he says, "Yeah, this is the interview
16   now."
17           "Do you understand?"
18           "I think I understand."  He then signs a written
19   statement of rights and waiver form.
20           I think the statement that, in the context of this
21   whole discussion, his statement that he thinks he
22   understands was in response to whether or not -- was in
23   response to Special Agent Squire's question of whether he
24   wanted to read his rights.
25           So I think there is clear evidence that
```

1    Mr. Harrell knew and understood and voluntarily waived his

2    rights.

3              Similarly, when you go back to -- you look back to

4    the conversation that took place in the car, they go over

5    all those rights again.  He seems, at least to the Court, to

6    understand those rights indicating that he is willing to

7    talk, and so the motion to suppress his statements will be

8    denied.

9              As it relates to the motion to suppress evidence,

10   the search warrant at his parents' home, I understand the

11   defense's argument about FS 1, but I don't think that the

12   standard is such that you need to have, for lack of a better

13   term, fully vetted FS 1.

14             This is information that was provided to law

15   enforcement, they corroborated this information -- just want

16   to go through my notes from this hearing.

17        (Brief pause in the proceedings.)

18        THE COURT:  Yes.  Ultimately, I think there was

19   enough evidence of the corroboration of the information that

20   was provided by FS 1.  Talking about sufficiently

21   identifying information about a person named Soole and

22   War Titan, all of those connected to Mr. Harrell.  Then we

23   find out that Mr. Harrell lives at a place that's registered

24   as a day care center.  There is photography or photos

25   showing that he worked at the Cinemark theater, same type of

1    theater that Soole sent photographs to FS 1.

2            So I think there is enough corroborating evidence,

3    and the tip was more than sufficient to meet the burden of

4    probable cause to issue a warrant in this case.

5            Next, as relates to Mr. Harrell's motion to sever,

6    again, I think there is significant overlap with all the

7    counts here as mentioned in both motions to sever.  It is a

8    very high burden to show a clear manifest or undue prejudice

9    from a joint trial, and I don't think that that burden has

10   been met in this case; so Mr. Harrell's motion to sever is

11   denied.

12           Now we move on to Mr. Brinson.  Mr. Nicolaysen

13   presented a very impassioned and thorough argument as well

14   with respect to the motion to suppress post-arrest

15   statements.

16           Respectfully I don't agree.  Ultimately I am going

17   to deny the motion to suppress the statements.  He was read

18   the Miranda rights.  I think it was clear that he understood

19   those rights, he knowingly gave them up.  I believe the

20   statement, "You said I could have an attorney," is not an

21   invocation.  It is a question.

22           I don't believe there has been evidence -- or

23   adequate evidence that there was -- of someone's will being

24   overborne during the process.  Yes, the interview took many

25   hours but that -- wrong or right, that's what happens in

 1   these types of cases.

 2            They utilize tactics of time to talk with and

 3   perhaps even gain trust or confidence or -- of Mr. Brinson.

 4   But I don't believe that there is evidence that there was --

 5   that somehow he was overtaken and that his physical

 6   condition or -- his physical condition somehow impacted his

 7   ability to knowingly and voluntarily waive his rights and

 8   engage in a discussion.

 9            I'm not as convinced as the government that the

10   follow-up letter further supports it, but I don't think it's

11   necessary for purposes of this analysis.

12            The motion to suppress -- so the motion to

13   suppress statements is denied.

14            Moving on to the motion to suppress the physical

15   evidence.  Again, there are a lot of issues here.  I

16   ultimately do not believe a Franks hearing is warranted

17   because there was probable cause ultimately to search this

18   car for a number of reasons.

19            I believe, based on the evidence that was

20   presented, that the agents saw Mr. Brinson walking to the

21   car and they were able to see his computer bag and blanket

22   in plain view, whether it was through the tint or through

23   the open door, and I do agree with the government that the

24   statements that Mr. Nicolaysen so adequately and

25   articulately pointed out as perhaps inconsistent or raising

 1   questions -- I think ultimately those statements don't

 2   really have anything to do with probable cause.

 3            And as -- and I disagree with Mr. Nicolaysen as it

 4   relates to the issue of seeing an individual charged or

 5   believed to be involved in a criminal enterprise involving

 6   child exploitation and child abuse with a victim.  I think

 7   law enforcement could easily have been of the belief that

 8   there may be evidence of a crime contained in the car.

 9            I think it is similar to the car chase scenario

10   that Mr. Nicolaysen described because we don't know where

11   this abuse took place -- or we have evidence that abuse took

12   place in some location but we don't know if that's the limit

13   of that, and I think it was reasonable for the officers to

14   believe that there might be evidence of crime contained in

15   the car.

16            I also believe that this does fit within the

17   automobile exception.  Once all of this stuff was done, you

18   have a car that was parked on the wrong side of the street.

19   It was going to get towed.  I think there was a realistic

20   concern that, given the nature of the charges and given

21   that -- the proximity of the car to the victim's family

22   members, that there might be some issues as it relates to

23   the car's security and damage to that car.

24            Based on that, I am going to deny the motion to

25   suppress the physical evidence as it relates to Mr. Brinson.

```
 1            Finally and lastly is the motion to sever.  And I
 2   will acknowledge this was one that I wrestled with at length
 3   prior to the hearing, trying to read all the cases I could
 4   on this because admittedly in the big scheme of things
 5   Mr. Lawniczak's allegations and the evidence is not as
 6   voluminous, if you will, compared to the co-defendants.
 7            But the case law makes clear that's not
 8   necessarily the standard, and that's not a basis to sever.
 9            Like Mr. Brinson, and quite frankly with all the
10   defendants in this case, there is significant spillover of
11   the evidence in this case but not so great that it impacts
12   Mr. Lawniczak's rights.
13            I had the government outline just moments ago
14   going through the counts, you are talking about several
15   counts involving an enterprise, Mr. Lawniczak's involvement
16   with respect to harboring a victim in the case,
17   destruction -- or I should say obstruction of evidence
18   concerning text messages that outline at length the abuse of
19   children that are alleged in the counts.  It seems to me
20   overall the burden has not been met to justify a severance
21   in this case.
22            So accordingly I am going to deny the motion to
23   sever.
24            If I understand correctly, we do have a trial date
25   set in this case for -- well, we have a status conference
```

```
 1    January 17th and jury trial date on the 28th.  So unless
 2    there is anything further that we need to discuss today, I
 3    will see you all for purposes of the trial.
 4              Miss Myers.
 5              MS. MYERS:  One quick point of clarification,
 6    Your Honor.  I think this was implied from the facts of your
 7    ruling, but I just want to make it clear that you are
 8    denying Defendant Harrell's motion to suppress the evidence?
 9              THE COURT:  Yes.  If I did not make that clear --
10    I am sorry.  I thought I went through my list of all the
11    motions.
12              MS. MYERS:  You did.  You just didn't use the word
13    "deny."
14              THE COURT:  I didn't use the buzz word.  So, yes,
15    the motion is denied.
16              Anything further from the government?
17              MS. MYERS:  No, Your Honor.
18              THE COURT:  Anything further from the defense?
19              We'll start with Mr. Nicolaysen.
20              MR. NICOLAYSEN:  Not from Defendant Brinson,
21    Your Honor.  Thank you for the Court's time.
22              THE COURT:  All right.
23              Mr. Castillo?
24              MR. CASTILLO:  No, Your Honor.  Thank you.
25              THE COURT:  Mr. Nishi?
```

1          MR. NISHI:  No, Your Honor.

2          THE COURT:  All right.  Have a good day, everyone.

3          THE CLERK:  All rise.  This Court is adjourned.

4      (Proceedings concluded at 12:51 p.m.)

5                        --oOo--

1                          CERTIFICATE

2

3        I hereby certify that pursuant to Section 753,

4   Title 28, United States Code, the foregoing is a true and

5   correct transcript of the stenographically reported

6   proceedings held in the above-entitled matter and that the

7   transcript page format is in conformance with the

8   regulations of the Judicial Conference of the United States.

9

10   Date:  May 23, 2022.

11

12

13

14                    _/S/ CHIA MEI JUI_____

15                    Chia Mei Jui, CSR No. 3287

16

17

18

19

20

21

22

23

24

25